IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ESTEFANY MARIA RODRIGUEZ FLOREZ, <br><br> Petitioner, <br><br> v. <br><br> Scott LADWIG, Field Office Director of Enforcement and Removal Operations, New Orleans Field Office, Immigration and Customs Enforcement, *et al.* <br><br> Respondent. | Case No. 3:26-cv-00247 <br> Judge Richardson |

## PETITIONER'S REPLY TO RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE

Petitioner Estefany Maria Rodriguez Florez (Rodriguez) replies to the Respondents' effort to show cause for her arrest and detention, which Rodriguez alleges have been effected in violation of the Fourth Amendment, the First Amendment, and the Due Process Clause of the Fifth Amendment.

The Respondents have failed to show cause. They have declined to submit even a single declaration from a single person. They have failed to explain irregularities obvious on the face of their documentation. Their discussion of the substantive claims mainly amounts to asserting they have done nothing wrong. And they base their procedural defenses on misconceptions about the nature of Rodriguez's claims. The Court should find the Respondents have failed to show cause, it should declare they have violated Rodriguez's statutory and constitutional rights, it should order them to release her immediately, and it should enjoin them from re-detaining her absent a material change in circumstances.

## Introduction

Estefany Rodriguez is a journalist for *Nashville Noticias*. In recent months, she has regularly reported on local arrests by U.S. Immigration and Customs Enforcement (ICE). By reporting on arrests that tear at our society's fabric yet would otherwise go unpublicized, she exposes how ICE's cruel policies have needlessly created an "immigration nightmare" for law-abiding, hardworking immigrants like herself. (*Noticias* Stories, R.14-3, PageID# 90.)

Less than two months after she started this reporting against ICE, ICE contacted her telling her it intended to begin removal proceedings against her. This contact was out of the blue. At the time, she was dutifully waiting for U.S. Citizenship and Immigration Services (USCIS) to interview her for her asylum application, and she had committed no crime and had done nothing wrong, except report on ICE's enforcement actions. In late February, ICE ultimately asked her to come to its field office for a consensual meeting on March 17, 2026. But, as she continued reporting on ICE on March 2 and 3, ICE agents decided, on March 4, to summarily seize her on the streets without a warrant, and then they also decided to ship her to a Louisiana detention center where she would remain detained for a substantial period of time.

In her habeas corpus petition, Rodriguez challenges this arbitrary arrest and detention. Her challenge is based on a principle dear to the United States: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987).

Painting with a broad brush, the Respondents speak as if Rodriguez is challenging their decision to commence removal proceedings or a decision to refuse to give her a bond hearing. They do so in order to make those claims appear vulnerable to procedural defenses. But the

2

Respondents have misstated her claims. Those claims actually are that ICE agents have abused *their power to arrest and detain* her in two ways: (1) they have acted abusively in violation of the Fourth Amendment and the statute that expressly curtails their arrest powers; and (2) they have also unconstitutionally retaliated against her for journalism exposing ICE's "immigration nightmare." (*Noticias* Stories, R.14-3, PageID# 90.)

These claims overlap in some ways. To make their substance and foundation clear, Rodriguez first gives a comprehensive statement of the facts. Second, she discusses each claim under the Fourth Amendment, the First Amendment, and the Due Process Clause. Third, with her claims clearly defined, she refutes the Respondents' procedural defenses. Finally, she asks that the Court declare the Respondents violated her statutory and constitutional rights, that it order her immediate release, and that it enjoin the Respondents from taking any future action that would punish or chill her speech, including an injunction against her physical detention absent a material change in circumstances. In the alternative, she requests the opportunity to conduct certain discovery.[1]

## I. Factual Background

**A.      Rodriguez regularly reported about ICE's "immigration nightmare," spotlighting arrests that otherwise would have received no public attention.**

The respondents, in keeping with their ongoing mistreatment, call Estefany Rodriguez an "illegal alien" (Resp., R.18, PageID# 114) even though there is no basis for using that term. She has never in her life committed any crime, much less an immigration crime. In March 2021, she

---

[1] This morning an immigration judge granted Rodriguez the opportunity to be released upon paying a bond. That ruling may eventually make an order for her release unnecessary, if in fact the Respondent Department of Homeland Security does not appeal that ruling and if in fact she is released. But Rodriguez presently remains in custody, and, in any event, her request for declaratory and injunctive relief will remain.

3

entered the United States lawfully on a visa. (Form I-213, R.9-2, PageID# 47.)[2] In July 2021, she

timely applied for asylum due to persecution she feared in Colombia for her journalism. 8 U.S.C.

§ 1158(a)(2)(B) (providing that any noncitizen physically present in the U.S. may apply for

asylum and establishing a one-year time limit from the date of the noncitizen's arrival for doing

so). (*See* Form I-213, R.18, PageID# 47.) She had to wait for that application to be addressed

through an interview by an asylum officer working for USCIS. *See The Affirmative Asylum*

*Process*, U.S. Citizenship & Immigr. Servs. (last updated Oct. 17, 2025).[3] Although she

submitted that application before her visa expired, USCIS did not adjudicate it before then.

      When that visa did expire in September 2021, she remained in the United States. (Form I-

213, R.18, PageID# 47.) Presence in the United States while a bona fide asylum application is

pending is generally not considered "unlawful" under U.S. immigration laws,[4] and cannot

possibly be considered a crime. *Arizona v. United States*, 567 U.S. 387, 407 (2012) (citing *INS v.*

*Mendoza-Lopez*, 468 U.S. 1032, 1038 (1984)). Indeed, she had little choice but remain since she

faced persecution in Colombia and since moving from the United States would constitute

abandonment of her asylum application. 8 C.F.R. § 208.8(a).

---

[2] In contrast, entering without permission is a misdemeanor, 18 U.S.C. § 1325(a), although even
that offense is non-continuing so someone who entered without permission and is living in
Tennessee is not committing a crime. *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th
Cir. 1979).

[3] https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/the-affirmative-asylum-
process.

[4] *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(II) (no period of time during which a bona fide asylum
application is pending shall be construed as "unlawful presence" for purposes of 8 U.S.C. §
1182(a)(9)(B)(i)); *see also Unlawful Presence and Inadmissibility*, U.S. Citizenship & Immigr.
Servs., https://www.uscis.gov/laws-and-policy/other-resources/unlawful-presence-and-
inadmissibility (last updated Jan. 25, 2025) (stating that "[g]enerally, time while a bona fide
asylum application is pending is not counted as unlawful presence.").

USCIS was fully aware of her ongoing presence. In February 2022, USCIS granted her a work permit, under which she could work while waiting for her asylum interview. (Form I-213, R.9-2, PageID# 47.) At all times, she maintained contact with USCIS.

Under that work permit, Rodriguez worked as a journalist for *Nashville Noticias*, a Spanish-language news outlet. As the Trump Administration implemented highly controversial immigration policies, *Nashville Noticias* covered their local impact. That was risky because the Trump Administration frequently attacked journalists who criticized it, flagrantly violating the First Amendment.[5] These attacks came from very high, often from President Trump himself.[6]

---

[5] *See, e.g.*, *Dickinson v. Trump*, No. 3:25-cv-2170-SI, 2026 U.S. Dist. LEXIS 47775, at *4 (D. Or. Mar. 9, 2026) (granting motion for preliminary injunction against DHS in First Amendment challenge brought by journalists and protesters in Portland who were prevented from engaging in free speech by DHS' use of excessive force through less lethal munitions); *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1045 (C.D. Cal. 2025) (granting preliminary injunction restraining DHS from using excessive force against journalists, protesters, and legal observers in Los Angeles in retaliation for constitutionally protected activity in violation of their First Amendment rights and noting DHS's "targeting [of] journalists," *id.*); *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 38 (D.D.C. 2025) (granting motion for preliminary injunction against public officials' First Amendment viewpoint discrimination and retaliation of barring Associated Press from press room after it continued to refer to the Gulf of Mexico as the Gulf of Mexico in its style book), *appeal filed*, No. 25-5109, (D.C. Cir. Apr 10, 2025); *Chi. Headline Club v. Noem*, No. 25 C 12173, 2025 U.S. Dist. LEXIS 228549, at *10 (N.D. Ill. Nov. 20, 2025) (granting preliminary injunction against DHS in First Amendment challenge brought by a coalition of Chicago-based journalists who sued the Trump administration over the injuring of members of the press and other actions taken by federal agents which impede journalists ability to exercise their speech rights), *vacated*, No. 25-3023, 2026 U.S. App. LEXIS 6598 (7th Cir. Mar. 5, 2026); *In re Search of the Real Prop. and Premises of Hannah Natanson*, No. 1:26-sw-00054 (WBP), 2026 U.S. Dist. LEXIS 38139, at *2 (E.D. Va. Feb. 24, 2026) (granting in part motion for return of property to reporter after FBI raided her home and "seiz[ed] the totality of [her] electronic work product," *id.* at *23, finding it impeded her from newsgathering and restrained her First Amendment rights). *See generally Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 167–69 (D. Mass. 2025) (collecting cases of First Amendment retaliation by the Trump administration against law firms, higher education, and the media).

[6] *See, e.g.*, Melissa Quinn, *Trump lashes out at female reporters, calling them "ugly," "stupid" and "piggy"*, CBS News (Nov. 28, 2025 12:10 PM), https://www.cbsnews.com/news/trump-calls-female-reporters-ugly-piggy/ ("'Are you stupid? Are you a stupid person? . . . [Y]ou're just asking questions because you're a stupid person,' Mr. Trump responded. . . . While speaking to

At least with respect to the Department of Homeland Security and ICE, those attacks also

came at the street level. ICE agents attacked journalists violently[7] and retaliated against them in

_____

members of the press on Air Force One earlier this month, the president snapped at Bloomberg White House correspondent Catherine Lucey, telling her 'Quiet. Quiet, piggy.' . . . He called [the New York *Times*] a 'cheap "rag"' that is 'truly an "enemy of the people."' 'The writer of the story, Katie Rogers, who is assigned to write only bad things about me, is a third rate reporter who is ugly, both inside and out,' Mr. Trump wrote on Truth Social."); Brett Samuels, *Trump hits ABC reporter as 'obnoxious'*, The Hill (Dec. 8, 2025 3:44 PM), https://thehill.com/homenews/media/5639245-trump-lashes-abc-reporter/ ("Let me just tell you, you are an obnoxious – a terrible, actually a terrible reporter."); Kathryn Wilkens, *Trump Drops Unhinged Attack on Maggie Haberman, Threatens to Sue Her*, Yahoo News (Mar. 13, 2026 3:57 PM), https://www.yahoo.com/news/articles/trump-drops-unhinged-attack-maggie-205706609.html ("Maggot Hagerman [[referencing New York *Times* reporter Maggie Haberman)], just another SLEAZEBAG writer for The Failing New York Times . . . . I'm thinking of adding Maggot, and some of her 'associates,' into my Florida based Lawsuit against The Times . . . .").

[7] *See, e.g.*, Dave Savini & Samah Assad, *Pepper ball fired at CBS Chicago reporter part of incidents involving media outside Broadview ICE facility*, CBS News (Sept. 29, 2025 9:48 PM), https://www.cbsnews.com/chicago/news/incidents-involving-media-outside-broadview-ice-facility/ ("'An ICE agent who was masked shot directly at my car,' Rezaei recounted on camera after the incident. 'He saw my window was open.' The chemicals from the shot caused burning to her face, leading to her vomiting outside her truck."); Stephanie Kaloi, *Minneapolis TV Reporter Pepper Sprayed While Covering 2nd Deadly Shooting by ICE Agents*, Yahoo! News (Jan. 24, 2026 12:38 PM), https://www.yahoo.com/news/articles/minneapolis-tv-reporter-pepper-sprayed-183842266.html ("'They started to push and move the line. And I started to back up and this one officer just pushed me really hard and I said, "Do not push me. I'm press."' She continued: 'And then he did it again and I fell backwards and I said, "I'm press." And then I felt this burn in my eye.'"); *USA: ICE must respect journalists' rights by following its own rules*, Reporters Without Borders (RSF) (Oct. 15, 2025), https://rsf.org/en/usa-ice-must-respect-journalists-rights-following-its-own-rules ("Wali Khan, an independent documentary filmmaker and journalist . . . was shot with pepper ball rounds while covering protests at the Broadview facility on September 27. 'They started firing indiscriminately,' he told RSF. 'If you had a camera, you were a target.' He also described how ICE agents deliberately corralled journalists into a contained space, then fired tear gas, forcing the journalists to walk through it."); Michael R. Sisak, *Federal agents grab and shove journalists outside NYC immigration court, sending one to hospital*, Associated Press (Sept. 30, 2025 6:54 PM), https://apnews.com/article/nyc-immigration-journalists-shoving-manhattan-84d95f26278aa406eed37d72ed213452 ("A visual journalist . . . hit his head on the floor at 26 Federal Plaza in Manhattan after U.S. Immigration and Customs Enforcement agents pushed one journalist off a public elevator and shoved another journalist to the floor . . . . Video showed him in a neck brace as paramedics wheeled him out of the building on a stretcher.").

6

other ways.[8] When a low-level agent's abuse of a journalist was exposed, high-level officials

would defend the abusive conduct.[9] Increasingly, the administration campaign of retaliation

against journalists has extended to criminal[10] and immigration arrests and detention.[11]

---

[8] *See, e.g.*, *USA: ICE must respect journalists' rights by following its own rules*, supra note 7 ("Broadview's police chief has also accused ICE of making false 911 calls targeting journalists, putting them at unnecessary risk. According to the chief, ICE agents claimed someone was trying to break into their facility, but police body camera footage showed officers arriving at the scene and finding only two reporters standing outside, filming the building.")

[9] *See, e.g.*, Savini & Assad, *supra* note 7 ("A spokesperson for DHS in a statement said, 'No member of the media at CBS or any other outlet was "attacked." For their safety, we remind members of the media and journalists to exercise caution as they cover these violent riots.'"); Sisak, supra note 7 ("Homeland Security Assistant Secretary Tricia McLaughlin defended the agents' actions, saying they were being 'swarmed by agitators and members of the press, which obstructed operations.'"); David Bauder, *With reporters shot and roughed up, advocates question whether those covering protests are targets*, Associated Press (June 11, 2025 11:25 AM) https://apnews.com/article/immigration-protests-los-angeles-media-4b9b062785bde9428a3155812fd092de ("Noem's assistant secretary, Tricia McLaughlin, said the department reminds journalists to exercise caution. . . . 'President Trump and Secretary Noem are committed to restoring law and order in Los Angeles.'").

[10] *See, e.g.*, Ryan J. Reilly et al., *Don Lemon arrested after covering protest at Minnesota church*, NBC News (Jan. 31, 2026, 8:34 AM), https://www.nbcnews.com/news/us-news/don-lemon-arrested-federal-authorities-attorney-says-rcna256680 ("Former CNN anchor Don Lemon was arrested on Friday and accused of violating federal civil rights law in connection with his coverage of a protest at a Minnesota church earlier this month. . . . The Trump administration attempted to keep them and three other protesters — a total of six of Lemon's co-defendants — detained until trial, according to court records, but federal magistrate judges in Minnesota rejected their request for a detention hearing.").

[11] *See* Liam Reilly, *Live-streaming journalist deported to El Salvador after months in ICE custody*, CNN (Oct 3, 2025, 4:38 PM), https://www.cnn.com/2025/10/03/media/mario-guevara-journalist-deported-ice-el-salvador ("Mario Guevara, the Salvadoran journalist who gained popularity by documenting immigration raids, has been deported after spending months in federal custody. . . . Although prosecutors dropped criminal charges stemming from Guevara's arrest, determining that he had complied with law enforcement, the government argued that Guevara ought to be kept in detention, alleging his live-streaming of law enforcement activities presented a risk to their work."); Michael Sainato, *ICE detains British journalist after criticism of Israel on US tour*, The Guardian (Oct 26, 2025 5:16 PM), https://www.theguardian.com/us-news/2025/oct/26/ice-detains-british-muslim-journalist-laura-loomer; Catherine Jones, *Mario Guevara reported on immigration. After he was deported, he became the story.*, Atlanta Magazine (Jan. 22, 2026), https://www.atlantamagazine.com/news-culture-articles/mario-guevara-reported-on-immigration-after-he-was-deported-he-became-the-story/ ("I am the first

7

As a reporter, Rodriguez entered this fray in about May 2025 but played an increasingly public role reporting on ICE starting in about November 2025. In late November, she reported on two particularly cruel deportations of working men who had lived in the United States for two decades and were torn from their families. (*Noticias* Stories, R.14-3, PageID# 87.) In December, she reported on ICE about twice each week, covering, among other things, cruel deportations, a construction site raid, and a "mass arrest" of people appearing in traffic court. (*Id.* PageID# 88–90.) In 2026, her reporting continued apace as she continued to spotlight ICE's creation of an "immigration nightmare." (*Id.* PageID# 90–96.)

**B.      ICE arranged for a consensual meeting with Rodriguez to be held March 17, 2026.**

As of January 2026, Rodriguez was living with her seven-year-old daughter and her fiancé, planning to marry on January 21. (Amend. Pet., R.14, PageID# 70.) And she was still waiting for her interview with a USCIS asylum officer.

In January, she received a Form G-56 letter from ICE, asking her to "[p]lease" come to its field office in Nashville on January 26, 2026. (First Form G-56, R.1-1, PageID# 9.) The letter indicated that, at that consensual meeting, ICE intended to issue a Notice to Appear (NTA). (*Id.*)

An NTA is the charging document that ICE must use to start removal proceedings. 8 U.S.C. § 1229(a)(1). If issued an NTA, Rodriguez would have to present her asylum claim in immigration court, rather than initially presenting it to a USCIS asylum officer, which would reduce her chances of winning asylum.[12] And, if issued an NTA, ICE would decide whether to

---

and only journalist who has been arrested and deported under the Trump administration. But, possibly, I will not be the last.").

[12] Transactional Records Access Clearinghouse, *A Mounting Asylum Backlog and Growing Wait Times*, at 6 (2021), https://tracreports.org/immigration/reports/672/ (showing odds of prevailing to be 26% for asylum petitioners starting in court and 45% for those starting with a USCIS interview).

issue an arrest warrant—which cannot be issued in the absence of an NTA (*see infra* pp. 16–17)—in order to detain her "pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). If ICE made the decision to detain her, she would remain detained at least until she could get a "bond redetermination" hearing before an immigration judge, presumably in immigration court in Louisiana. 8 C.F.R. § 1236.1(d)(1); 8 C.F.R. § 1003.19(b). On the other hand, if ICE decided not to detain her after issuing an NTA, she would proceed with her asylum claim in immigration court in Memphis, while continuing to live with her family and work for *Nashville Noticias*. And, of course, ICE could decline to issue an NTA altogether and allow her to continue, as planned, with a USCIS asylum interview.

Because of the possible bad outcomes, the G-56 letter was concerning. But it advised her to come to the meeting to "ensure the best outcome for [her] case." (Form G-56, R.1-1, PageID# 9.)

Rodriguez and her fiancé married as planned on January 21, and through their immigration lawyer, Joel Coxander, petitioned USCIS for residency status through that marriage. (Form I-213, R.9-2, PageID# 48.) On January 25, the date scheduled for the consensual meeting, a massive winter storm closed the ICE field office. (Form I-213, R.9-2, PageID# 48; Amend. Pet.14, R.70.) Through a second G-56 letter, ICE rescheduled the meeting for February 25. (Second Form G-56, R.1-1, PageID# 10.) Two days beforehand, on February 23, her husband and her immigration lawyer's agent (another lawyer) went to ICE field office in Nashville to try to resolve the situation and perhaps accept service of an NTA, but ICE agents could not find any appointment in their system, and the agents sent them away with a document setting an appointment for Rodriguez for March 17, 2026. (Form I-220B page two, R.1-1, PageID# 11; Form I-213, R.9-1, PageID# 48 (acknowledging the upshot of February 23rd was that "officers gave her a new report date of March 17, 2026").)

9

**C.    Rather than wait for the March 17 hearing, ICE agents arrested Rodriguez, who was continuing to report on ICE arrests.**

On March 2, Rodriguez covered another mass arrest by ICE at traffic court, and on March 3, she aired another story about multiple arrests. (*Noticias* Stories, R.14-3, PageID# 96.)

On March 4, several ICE agents surrounded her in her *Nashville Noticias* car as her husband parked it at the gym. (Amend. Pet., R.14, PageID# 71.) At least one agent, it was later learned, possessed a previous photo of her *Nashville Noticias* vehicle in his phone. (*Id.* PageID# 72.) Also, the agents showed they were already fully aware that her husband was a U.S. citizen and that she had applications for status pending. (Ex. 1, Medina Aff.) Nonetheless, the agents arrested her, handcuffed her, and drove her to the ICE field office—all without showing her any documentation whatsoever. (*Id.*; *see* Form I-213, R.9-2, PageID# 47.)[13] Were Rodriguez not whisked away, she herself would have reported on this arrest.

**D.    At the field office, the Examining Officer processed Rodriguez's warrantless arrest and decided to detain her pending a decision in her removal case.**

After arresting Rodriguez, the ICE agents drove her, handcuffed, to the ICE field office. While she was en route to that office, her immigration lawyer, Coxander, spoke with a supervisor there and explained that, through their proactive efforts, Rodriguez's consensual meeting had been scheduled for March 17, which is a fact that the supervisor understood to be true. (Amend. Pet., R.14, PageID# 72; *see* Form I-213, R.9-2, PageID# 48 (confirming date was March 17).)

Rodriguez was processed by an examining officer who did three things mandated by the warrantless-arrest regulation. 8 C.F.R. § 287.3; *see* 8 U.S.C. § 1357(a)(2) (requiring that this

---

[13] The Respondents have implicitly conceded no documents were shown or served on her at any time prior to her being at the ICE field office. As discussed below, they nonetheless claim the arrest was not warrantless.

examination be conducted "without unnecessary delay" for a noncitizen subjected to a warrantless arrest").

First, through a contract interpretation service, the examining officer questioned Rodriguez, who answered most questions, but declined to give her seven-year-old daughter's name. *See* 8 C.F.R. § 287.3(a) (mandating this examination). (Form I-213, R.9-2, PageID# 46–48 (mentioning interpretation service, Rodriguez's "oral statements," and her responses to various questions); Warrant Dated March 4, R.15-1, PageID# 101 (referring to "deferred inspection" and possible "statements made voluntarily by the subject to an immigration officer").)[14]

Second, the examining officer decided to issue the NTA. *See* 8 C.F.R. § 287.3(b) (directing the examining officer to either "refer the case to an immigration judge . . . or take whatever action may be appropriate.") (NTA, R.18-2, PageID# 133; Form I-213, R.9-2, PageID# 47.) That NTA would place Rodriguez in removal proceedings so, as mentioned, her asylum application would be addressed by the immigration courts, which have a backlog of 2.3 million asylum cases, rather than by the asylum office. (Amend. Pet., R.14, PageID# 71, n. 8 (citing Transactional Records Access Clearinghouse, *Immigration Court Quick Facts*).)

Third, the examining officer decided to "continue[] [Rodriguez] in custody" rather than "release[] [her] on bond or recognizance." 8 C.F.R. § 287.3(d). (Warrant Dated March 4, R.15-1, PageID# 101; Form I-213, R.9-2, PageID# 47.) That decision would mean that Rodriguez would remain detained—for at least days or weeks—while transported to an immigration detention center in another state and while waiting for a "bond redetermination" hearing before an

---

[14] The Respondents did not file this warrant dated March 4 with the Court, but rather Petitioner obtained it from a post that Respondent DHS made on X.com. (Pet. Sup. Resp., R.15, PageID# 98.)

immigration judge.[15] The officer made that decision to continue detaining Rodriguez even though Rodriguez, whom the local agents knew to be a *Nashville Noticias* journalist, had lawfully entered on a visa, had timely applied for asylum, had duly maintained contact with USCIS, had married a U.S. citizen, had petitioned for marriage-based status, had no criminal history, had a steady employment record, had ties to the community, and had a seven-year-old daughter at home. The examining officer had a deportation officer serve both the NTA and the warrant on Rodriguez. (Warrant of March 4, R.15-1, PageID# 101; NTA, R.18-2, PageID# 134.)

In sum, two decisions were made to detain Rodriguez. First, in the field, ICE agents arrested Rodriguez without a warrant even though it was obvious she was not "likely to escape before a warrant c[ould] be obtained for h[er] arrest," 8 U.S.C. § 1357(a)(2). Next, in the field office, the examining officer decided to detain her and ship her to Louisiana even though there was every reason—except for her reporting on ICE—to release her on recognizance with a date to appear in the Memphis immigration court.

**E.     These arrest and detention decisions—which go beyond the decision to issue an NTA—triggered at least 12 days of deprivation of liberty under harsh conditions.**

Later in the day on March 4—after her habeas corpus petition was filed—Rodriguez was transported to a county jail in Etowah, Alabama. She was held in that jail from Wednesday, March 4 through Thursday, March 12. The Etowah jailers refused to set up an attorney-client call between Rodriguez and counsel, saying that they simply do not do attorney calls.

On Thursday, March 12, Rodriguez was transported to the South Louisiana ICE Processing Center in Basile, Louisiana. On Saturday, March 14, she was allowed a phone call

---

[15] The alternative, as mentioned above, would be to give Rodriguez a date to appear in immigration court in Memphis.

with counsel for the first time since she had spoken briefly with attorney Coxander from the ICE field office on March 4.

Due to their limited access to their client over the past twelve days, counsel has not gotten a full statement from Ms. Rodriguez about the conditions of her detention, but it is clear she suffered both physically and emotionally. One episode bears description.[16] After a day in the Etowah jail, Rodriguez was taken to an airplane for transport to Louisiana. An officer was looking at detainees' scalps, and Rodriguez felt her head was a little itchy. An officer asked her if she had lice, and she said no but that she had a young daughter in school. An officer made her go back to the jail, where they gave her shampoo and a comb. The woman who helped her comb out her hair indicated she saw no lice in her scalp. Yet Rodriguez was held in isolation for about five days. After those days in isolation, she was forced to go to a shower room and to strip naked, and then the officer poured some kind of chemical liquid on her head, which seemed to be something used to clean floors and which burned her eyes. The woman assisting cried to see the abuse.

On top of this, Rodriguez was barely able to communicate with her husband, and she was worried about her 7-year-old daughter and how to shield her from the fact that her mother had been taken by ICE.

On the morning of Monday, March 16, Rodriguez appeared before an immigration judge who has granted her a $10,000 bond (that must be paid in full), which was the only possible legitimate decision because every factor weighed in favor of release. *See Matter of Urena*, 25 I. & N. Dec. 140, 141 (BIA 2009); *Matter of Guerra*, 24 I & N Dec. 37, 39–40 (BIA 2006). Yet the DHS, at least initially, has reserved its right to appeal so Rodriguez remains in custody.

---

[16] Because counsel has had only one call with Rodriguez, counsel has not been able to review this account with Ms. Rodriguez to ensure all the particulars are exactly correct, but the account is certainly broadly accurate.

## II. Response Regarding Substantive Claims

**A.    The Respondents' own records establish a Fourth Amendment violation.**

The Fourth Amendment is violated when an individual is unlawfully seized. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (an arrest or detention constitutes a seizure). It is unlawful for an ICE agent to seize a person on suspicion of being removable unless the agent has probable cause to think that person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause.'" (quoting *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971))); *see also United States v. Cantu*, 519 F.2d 494, 496–97 (7th Cir. 1975) (stating § 1357(a)(2)' "likely to escape" requirement "is always seriously applied"); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio. 2016) ("This flight-risk determination is not mere verbiage. The Supreme Court held [immigration] officers to this constraint in *Arizona v. United States*, 567 U.S. 387 (2012).")

The Respondents do not dispute—and thereby implicitly concede—that, on March 4, ICE agents arrested Rodriguez without reason to believe she was likely to escape before a warrant for her arrest could be obtained. That concession is necessary because Rodriguez had lawfully entered on a visa, had timely applied for asylum, had duly maintained contact with USCIS, had married a U.S. citizen, had petitioned for marriage-based status, had no criminal history, had a steady employment record, had ties to the community, had a seven-year-old daughter at home, and had proactively, through a lawyer, arranged for a consensual meeting with ICE on March 17. The ICE agents arrested her in violation of § 1357(a)(2)'s "likely to escape" requirement, which

14

makes that arrest unlawful. *See, e.g., Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 U.S. Dist. LEXIS 198295, at *42–45 (N.D. Ill. Oct. 7, 2025) (finding such warrantless immigration arrests unlawful).

As case law cited by Rodriguez in her petition shows, this unlawful arrest is ground for immediate release from immigration custody. *See Rosada v. Figueroa*, No. CV 25-02157, 2025 U.S. Dist. LEXIS 156344, at *52 (D. Ariz. Aug. 11, 2025) (Rep. & Recommendation), *adopted by* 2025 U.S. 156336, at *53 (D. Ariz. Aug. 13, 2025). The Respondents have not disputed this point either.

The only thing the Respondents dispute is whether the arrest was, in fact, a warrantless arrest or instead was, as they claim, an "arrest[] pursuant to a valid arrest warrant." (Resp., R.18, PageID# 121.) The only proof they cite for this claim is an arrest warrant that is dated March 2 (two days *before* the NTA), that is unserved (its certificate of service is blank), that is incomplete (it lacks an A number), and that is handwritten and crumpled. The Respondents argue that this warrant somehow renders Rodriguez's arrest "pursuant to a valid arrest warrant" even though the warrant was *not* in fact served on her. (Resp., R.18, PageID# 121–22 & n.6.) That argument fails on the Respondents' own proof for at least two independent reasons.

First, the sole legitimate purpose of an administrative warrant is to authorize the detention of the noncitizen "pending a decision on whether the [noncitizen] is to be removed." 8 U.S.C. § 1226(a). Thus, an administrative arrest warrant cannot be issued until an NTA is being issued or has been issued. That fact is confirmed expressly by regulation. 8 C.F.R. § 236.1(b) ("*At the time of the issuance of the notice to appear, or at any time thereafter* and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest") (emphasis added). That fact is also confirmed by

15

caselaw. *Nava*, 2025 U.S. Dist. LEXIS 198295, at *43, 45–46, 53–54 (collecting cases concluding that for a warrant to be valid it cannot be issued prior to the NTA and holding "ICE lacked statutory and regulatory authority to engage in its policy of issuing I-200 warrants to [noncitizens] in the field without the concurrent or prior issuance of an NTA"). *See generally Abel v. United States*, 362 U.S. 217, 232 (1960) (approving the simultaneous issuance of the NTA and arrest warrant). Due to that fact, an arrest warrant issued *prior to* the issuance of the NTA is invalid, and an arrest pursuant to an invalid warrant of that type must be deemed warrantless. *Nava*, 2025 U.S. Dist. LEXIS 198295, at *42–45, 54. *See generally Saqr v. Holder,* 580 F.3d 414, 422 (6th Cir. 2009) ("The cancellation of a notice to appear also cancels any outstanding warrants issued by the Attorney General for the alien's arrest") (cleaned up). Here, the warrant touted by the Respondents is dated March 2, showing it was issued two days prior to the NTA, and thus it was invalid (assuming, for the sake of argument, that it was in fact issued). That is sufficient reason in and of itself to reject the Respondents' argument.

Second, as Rodriguez previously argued (Prelim. Reply, R.10, PageID# 53), in order for an immigration arrest warrant to be executed, it must be served on its subject. That is clear not only because it is common practice, Fed. R. Crim. P. 4(c)(3)(A), but because: (a) the applicable regulations use "execut[ion]" and "service" interchangeably, 8 C.F.R. § 287.5(e)(3); (b) the regulations also restrict the power to "serve[]" arrest warrants to certain agents, 8 C.F.R. § 236.1(b)(1); and (c) the NTA, which must precede the arrest warrant for the warrant, must itself be served personally on its subject. 8 U.S.C. § 1229(a)(1). Thus, the practice has long been, when making an arrest in the field pursuant to a warrant, to serve the warrant along with the NTA. *See e.g.*, *Abel*, 362 U.S. at 223 (describing how immigration agents "served petitioner with the warrant for his arrest and with the order to show cause," which is now called an NTA); *United*

*States v. Valdez-Hurtado*, 638 F. Supp. 3d 879, 895 (N.D. Ill. 2022) ("ICE guidance dating to 1993 called for immigration warrants to be served upon the person sought to be detained"). Indeed, it is precisely because service is required for execution of the warrant that the Form I-200 arrest warrant has a "Certificate of Service." (Warrant Dated March 2, R.9-1, PageID# 43.) Here, the warrant touted by the Respondents has a blank certificate of service. (*Id.*) It was not served; it was not executed. That is another sufficient reason to reject the Respondents' argument.[17]

Thus, the Respondents' own records show the arrest must be deemed warrantless both because the Warrant dated March 2 predates the NTA by two days and because it was not served. *Nava*, 2025 U.S. Dist. LEXIS 198295, at *42–45, 54. Yet it bears mention that the Respondents have even failed to prove that the pre-NTA, unserved warrant was actually issued on March 2. That document dated March 2nd is an oddity. It is incomplete because it lacks Rodriguez's "alien number"—was it a mere draft? It is merely handwritten—again, was it a draft? And it is crumpled—was it discarded? It has been submitted in the form of a photograph, not a scan—why would that be? Oddly enough, the Respondents have failed to submit any affidavit from anyone with personal knowledge about this warrant's origin and fate. These oddities suggest that the warrant dated March 2 never was actually issued or that, even if it was issued, it was subsequently "cancelled." 8 C.F.R. § 236.1(b)(2).[18] In any event, this odd warrant is immaterial

---

[17] The Respondents vaguely claim that 8 C.F.R. § 287.8(c) somehow authorizes an agent to make a warranted arrest without serving the warrant, but that claim is mistaken because, in relevant part, § 287.8(c) describes an agent's power to make a *warrantless* arrest, and of course when an agent is making a warrantless arrest he will not be serving a warrant. *See* 8 U.S.C. § 287.8(c)(2).

[18] By saying the warrant might not have actually been issued, Rodriguez is not necessarily asserting the handwritten warrant was a "post hoc fabrication" because it might have been a mere draft, but such fraud is possible. Christopher Slobogin, *Testilying: Police perjury and what to do about it*, 67 U. Colo. L. Rev. 1037, 1043 (Fall 1996) (reporting how, unfortunately, in some law

17

because, as the Respondents implicitly concede, it was issued before the NTA and it was not served.

The Court should declare that Rodriguez's rights under § 1357(a)(2) and the Fourth Amendment were violated by ICE's warrantless arrest and it should order her immediate release.

**B.      In violation of the First Amendment, the Respondents retaliated against Rodriguez for her public speech by summarily arresting her and by deciding to detain her for removal proceedings.**

Rodriguez has alleged that the Respondents retaliated against her for her past protected speech and in order to prevent or chill the future speech of herself and other journalists who report critically on ICE. (Amend. Pet., R.14, PageID# 75.) The Respondents curtly respond to this claim only by proposing that "First Amendment rights . . . may not even be applicable to an illegal alien" and by asserting that her claim is "without substance." (Resp., R.18, PageID# 122.) Their response lacks merit.

First, their proposal about the reach of First Amendment protections directly conflicts with longstanding precedent. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country"); *OPAWL v. Yost*, 118 F.4th 770, 776 (6th Cir. 2024) ("The Supreme Court has long held that '[f]reedom of speech and of press is accorded aliens residing in this country'" (quoting *Bridges*, 326 U.S. at 148)); *Rafeedie v. I.N.S.*, 795 F. Supp. 13, 22 (D.D.C. 1992) ("It has long been settled that aliens within the United States enjoy the protection of the First Amendment . . . ."). Indeed, this longstanding rule is necessary partly because the First Amendment protects democratic self-governance as a whole and ensures both the right to speak and the right to listen. *See Citizens United v. Fed. Election Comm'n*, 558

_____

enforcement cultures lying about searches and seizures in order to achieve one's goal becomes "routine").

U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach a consensus is a precondition to enlightened self-government and a necessary means to protect it."); *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). Under this precedent, the First Amendment clearly protects the past and future speech of Rodriguez, who entered this country lawfully, who has developed substantial connections to the community by residing here for five years and by marrying a U.S. citizen, and who works as a journalist, both informing community members and helping their stories reach the public discourse. The Respondents cite no law at all for their proposal. The Court should reject it.

Second, Rodriguez's claim has "substance." (Resp., R.18, PageID# 122.) Even though Rodriguez has not had the chance to conduct discovery, the existing records show ICE agents must have acted against her due to retaliatory animus, and that their action's speech-related consequences were not mere side effects of a legitimate action. Consider the following series of events, which Rodriguez has already alleged or proven through citation to evidence, and which the Respondents' have not denied (except for Point 6, as already discussed above) and thus should be accepted as true. 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true.").

1. In 2025, the Trump administration engaged in aggressive immigration enforcement actions across the United States, and it attacked journalists covering ICE's enforcement activities. (Amend. Pet., R.14, PageID# 68, SPJ Report, R.14-1, PageID# 79–81; RCFP Report, R.14-2, PageID# 85–86.) *See also supra* pp. 5–8 (citing additional proof, including

19

proof showing that high officials defend the retaliatory acts of street-level agents).

2. Starting in November, Rodriguez started regularly covering ICE arrests, and her stories were critical of ICE's practices and revealed how they impacted Nashville's immigrant community. (Amend. Pet., R.14, PageID# 68; *Noticias* Stories, R.14-3, PageID# 87–96.)

3. Just two months later, ICE sent her a G-56 letter indicating they had decided to, by planning to issue an NTA, send her asylum case to the immigration court rather than let her present it through a USCIS interview (Amend. Pet., R.14, PageID# 69; Records R.1-1, PageID# 9), even though the backlog of asylum cases in immigration court is 2.3 million applicants. (Amend. Pet., R.14, PageID# 71, n. 8.)

4. ICE ultimately, on February 23, 2026, asked her to come to the ICE field office for a consensual meeting on March 17, presumably to be served with an NTA. (Amend. Pet., R.14, PageID# 71; Records, R.1-1, PageID# 11; Form I-213, PageID# R.9-2, PageID# 48.)

5. Rodriguez, nonetheless, continued to publicly report on ICE's activities that were causing grievous pain to the immigrant community, including issuing such stories on March 2 and 3, 2026. (*Noticias* Stories, R.14-3, PageID# 96.)

6. On March 4, ICE agents, who were in possession of a photograph of Rodriguez's vehicle with the *Nashville Noticias* logo, whisked her off the street without even bothering to obtain an arrest warrant and in stark violation of the statute requiring them to first determine she was likely to escape before they could get a warrant, which is something they could not possibly determine. (Amend. Pet., R.14, PageID# 72; *see supra* pp. 14–18.) The decision to make this warrantless arrest subjected Rodriguez to public "humiliati[on]" on the street, *see Terry v. Ohio*, 392 U.S. 1, 25 (1968), and to "bodily restraint" while the agents took her to their field office. *Foucha v. Louisiana*, 504 U.S. 71,

80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.")

7.   At the ICE field office, a supervisory agent made another decision. That agent decided not only to serve her with an NTA, but also to issue and execute an arrest warrant. (Amend. Pet., R.14, PageID# 73; Warrant Dated March 4, R.15-1, PageID# 101.) This decision to arrest her on a warrant meant that Rodriguez, rather than reporting on a date certain to the Memphis immigration court, would be forcibly detained, held in county jail(s) in transit to an ICE detention center, and further held in that detention center at least until she could see an immigration judge for a "bond redetermination" hearing, which is a period that turned out to be 12 days during which she suffered humiliation, physical abuse, and anguish.

Notably, the supervisor's decision at the field office triggered an even more significant deprivation of her physical liberty than did the warrantless arrest on the street. *See Jones v. United States*, 463 U.S. 354, 361 (1983) ("It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'") (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)); *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). That decision was made with full awareness that every single consideration weighed in favor of releasing Rodriguez on recognizance and in favor of thereby allowing her to appear on a date certain at the Memphis immigration court. The only thing that would explain the decision to, instead, make her submit to being shipped to a Louisiana detention center—and to subject her to such a consequential deprivation of her physical liberty— is animus against her for her *Nashville Noticias* reporting. Even if Rodriguez had "no 'right'" to

21

release on recognizance from the field office, that decision violated the First Amendment because the government denied her release to "penalize[]" or "inhibit[]" her speech. *Perry v. Sinderman*, 408 U.S. 593, 597 (1972) ("For at least a quarter-century, this Court has made clear that, even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech.").

Thus, the Respondents are wrong when they flatly assert her First Amendment claim lacks "substance." (Resp., R.18, PageID# 122.) Her First Amendment rights were violated (1) when she was subjected to a warrantless arrest and (2) when she was ordered detained for shipment to Louisiana. Tellingly, the Respondents have declined to present a declaration from anyone with any personal knowledge of these events. Because the existing record establishes their agents acted on the prohibited animus, this Court should declare that Rodriguez's First Amendment rights were violated, should order her immediate release, and should enjoin the Respondents from taking any future action that would punish or chill her speech, including a specific injunction against her physical detention absent a material change in circumstances.

In the alternative, as discussed in Section IV below, Rodriguez asks that the Court grant discovery.

**C. For similar reasons, the Respondents have violated Rodriguez's rights under the Due Process Clause by detaining her for an illegitimate purpose.**

The Respondents seem to argue that Rodriguez (1) simply lacks "any evidence that she is being detained for any purpose" other than resolution of her removal proceedings; and, (2) that the availability of a bond hearing negates any claim she might have. (Resp., R.1, PageID# 120.) These arguments are unavailing.

22

First, as just set forth above, Rodriguez has in fact presented evidence—even without having the opportunity to engage in discovery—that ICE agents chose to detain her to retaliate against her exercise of First Amendment rights. (*See supra* p. 19–22.) Using immigration detention to punish and chill her speech violates Due Process because immigration detention cannot be used "for other reasons" than to effectuate removal proceedings. *Demore v. Kim*, 538 U.S. 510, 533 (2003) (Kennedy, J., concurring); *see Abel*, 362 U.S. at 226 (stating it would be "serious misconduct" for agents to use an immigration arrest warrant for an ulterior purpose, and such misconduct must be met with "stern resistance by the courts").

Second, an eventual bond hearing in immigration court is no cure for this violation. That is so both because Rodriguez's claim challenges the *reason* for her detention, not the *process* afforded to reach the detention decision, and because, in any event, an immigration court lacks the power to adjudicate a constitutional claim. *See Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006).

In sum, for largely the same reasons that her First Amendment claim has merit, so does her due process claim. Especially since the Respondents have declined to present any affidavit or evidence contradicting what the record shows, the Court should grant this claim on the present record. In the alternative, as discussed in Section IV below, Rodriguez asks that the Court grant discovery.

### III. Response to Procedural Defenses

With the substance of Rodriguez's claims set forth, it becomes obvious that the Respondents' procedural defenses miss the mark. A bond hearing does not cure these violations—the harm transpired at a minimum from her March 4th arrest through her March 12th bond hearing (and will continue until her release)—and, moreover, she seeks application of

constitutional norms and injunctive relief, which are both beyond the power of an immigration court. Nor is Rodriguez presently challenging the discretionary decision to "commence" removal proceedings by issuing an NTA, 8 U.S.C. § 1252(g); rather she is challenging the decisions to seize her from the streets and to ship her to Louisiana, both of which were unnecessary to commence proceedings. And, even if Rodriguez were challenging the decision to commence removal proceedings, the Court would have to exercise jurisdiction over her First Amendment claim because a post-removal judicial remedy would come too late to protect her First Amendment rights, and hence denial of review at this juncture would violate the Suspension Clause.

## A.   It would be improper to require Rodriguez to try to exhaust a putative administrative remedy for her claims.

Exhaustion of administrative remedies here is merely prudential, not jurisdictional, because no statutory provision clearly requires it.[19] *See Shweika v. Dep't of Homeland Security*, 723 F.3d 710, 719 (6th Cir. 2013). The Respondents suggest that the Court should require Rodriguez to exhaust her ability to seek release through a bond hearing in immigration court before this Court should exercise its discretion to adjudicate her habeas petition. (Resp., R.18, PageID# 115.)

That suggestion is unpersuasive. A litigant need not exhaust administrative remedies when an agency is not "empowered to grant effective relief." *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 575, n. 14 (1973)). Accordingly, "[t]he Sixth Circuit has held due process challenges generally do not require exhaustion because

---

[19] The Respondents, at R.18, PageID# 115, cited *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004), which erroneously ruled the exhaustion at issue there was jurisdictional. *Santos-Zacaria v. Garland*, 598 U.S. 411, 415 n.2, 419 (2023) (expressly abrogating *Ramani*).

[immigration courts] cannot review constitutional challenges." *Singh v. Lewis*, No. 4:25-cv-96, 2025 U.S. Dist. LEXIS 185696, at *5–6 (W.D. Ky. Sept. 22, 2025) (Jennings, J.) (citing *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006)). Here, Rodriguez makes constitutional challenges to the Respondents' conduct and seeks to enjoin them from engaging in similar conduct in the future, which is something immigration courts could not do. Nor could they provide a declaration that Rodriguez's detention from March 4 to 16 was unconstitutional. Thus, resorting to the immigration courts for this relief would be "futil[e,]" and requiring exhaustion would be improper. *Carr v. Saul*, 593 U.S. 83, 93 (2021) (citing *Bethesda Hospital Assn. v. Bowen*, 485 U.S. 399, 405–406 (1988); *Mont. Nat'l Bank of Billings v. Yellowstone Cnty.*, 276 U.S. 499, 505 (1928)).

The cases cited by the Respondents are inapposite. *Ramani* and *Rabi* addressed the exhaustion requirement in 8 U.S.C. § 1252(d)(1), which applies to challenges of orders of removal—which is not the issue here. *Ramani*, 378 F.3d at 559; *Rabi v. Session*, No. 18-3249, 2018 U.S. App. LEXIS 19661, at *1–2 (6th Cir. July 16, 2018). And in *Rabi*, the Sixth Circuit noted expressly that challenges to immigration custody and bond determinations fell outside the scope of Section 1252. 2018 U.S. App. LEXIS 19661, at *1–2. Finally, in *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), the Second Circuit noted the substantial distinction between the statutory requirements imposed by Section 1252 and the judicially created, flexible, and less stringent exhaustion doctrine that applies to habeas actions. *Id.* Nothing the Respondents cited remotely supports their argument in this situation.

Finally, it bears noting that Rodriguez does seek immediate release, and the immigration courts can provide her release on bond. But that is only one aspect of her case, and if this morning's ruling on bond were appealed or somehow not effectuated, the need for immediate

release would continue unabated. And this Court could grant that relief immediately on constitutional grounds and without requiring a bond, whereas seeking that relief on those grounds in immigration court would be "futil[e.]" *Carr*, 593 U.S. at 93. Even with respect to that particular form of relief, it would be wholly inappropriate to require exhaustion.

**B.      Section 1252(g) does not bar this Court's review.**

Section 1252(g) of Title 8 of the U.S. Code says courts cannot review any claim "arising from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Respondents argue that § 1252(g) "squarely bar[s]" "the decision to detain an alien pending . . . removal proceedings." (Resp., R.18, PageID# 115.)

This sweeping argument was essentially foreclosed decades ago when the Supreme Court, construing § 1252(g), said "[i]t is implausible that the mention of three discrete events along the road to deportation [*viz*, commencement, adjudication, and execution] was a shorthand way of referring to all claims arising from deportation proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). Following *AADC*, the Seventh Circuit expressly held § 1252(g) does not bar habeas challenges that "concern[] detention while the administrative process lasts." *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999); *accord Duy Dac Ho v. Greene*, 204 F.3d 1045, 1051 (10th Cir. 2000) (same), *abrogated on other grounds by Zadvydas v. Davis*, 533 U.S. 678 (2001).

Here, Rodriguez challenges decisions to detain her by arresting her on the street and then by shipping her to Louisiana for further detention pending removal proceedings. Granted, in some cases, such detention is part and parcel of the decision to commence removal proceedings because, typically due to prior convictions, many noncitizens are subject to mandatory detention

26

pending those proceedings. *See, e.g.,* 8 U.S.C. § 1226(c). But Rodriguez is not subject to mandatory detention under any statute. Rather, the detention decisions she challenges were made *in violation* of statutory law (8 U.S.C. § 1357(a)(2)) and in violation of the First, Fourth, and Fifth Amendments. *See Bello-Reyes v. Gaynor*, 985 F.3d 696, 699, 700 n.4 (9th Cir. 2021) (holding that the petitioner's claim that his "re-arrest and detention constitution an unconstitutional retaliation against his protected speech" was not foreclosed by § 1252(g)). It is impossible to claim that the detention decisions challenged by Rodriguez were part and parcel with the commencement of removal proceedings against her.

Thus, it is unsurprising that nothing the Respondents cite provides meaningful support to their assertion. (*See* Resp., R.18, PageID# 115–16.) Some cases they cite involve noncitizens who, unlike Rodriguez, were subject to some form of mandatory detention. *See Wang v. United States*, No. CV 10-0389 SVW (RCX), 2010 WL 11463156, at *1 (C.D. Cal. Aug. 18, 2010) (stating immigration authorities were *required* to detain the petitioner because he was classified as an "arriving alien"); *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 298 (3d Cir. 2020) (stating immigration authorities were *required* to detain the petitioner in the course of executing a removal order). Others involve *Bivens* and Federal Tort Claims Act claims for noncitizens seeking damages for the delay it took the immigration court to adjudicate their claims for voluntary departure. *See Valencia-Mejia v. United States*, No. CV 08–2943 CAS (PJWX), 2008 U.S. Dist. LEXIS 110436, at *2 (C.D. Cal. Sept. 15, 2008); *Herrera-Correra v. United States*, No. CV 08-2941 DSF (JCX), 2008 U.S. Dist. LEXIS 127169, at *1–2 (C.D. Cal. Sept. 11, 2008). Indeed, the Eleventh Circuit case cited by Respondents actually lends support to Rodriguez's position. *See Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1202, 1204 (11th Cir. 2016) (stating § 1252(g) must be interpreted "narrowly" and concluding "§ 1252(g) is no

27

impediment to adjudicating claims that challenge 'detention while the administrative process lasts.'" (quoting *Parra*, 172 F.3d at 957)).

In sum, no case cited by the Respondents involves a habeas petitioner, like Rodriguez, who challenges detention decisions *that were not* required as part of the removal process and *that are* alleged to violate statutory or constitutional demands. In Rodriguez's situation, § 1252(g) simply does not bar challenges that "concern[] detention while the administrative process lasts." *Parra*, 172 F.3d at 957.

Finally, there is one final, yet crucial, consideration. If this Court were to hold that § 1252(g) does strip it of jurisdiction over her First Amendment claims, that ruling would violate the Suspension Clause, U.S. Const. art. I, § 9, cl. 2, because judicial review that comes only after her removal proceedings would not be an "adequate substitute" for habeas review. *INS v. St. Cyr*, 533 U.S. 289, 305 (2001); *see Ragbir v. Homan*, 923 F.3d 53, 70–71 (2d Cir. 2019), *cert. granted, remanded, and vacated sub nom. on other grounds, Pham v. Ragbir*, 141 S. Ct. 227 (2020) (so holding with respect to First Amendment claims that immigration enforcement actions were retaliatory).

## C. Rodriguez did not name the wrong Respondent.

The Respondents' contention that "there is no properly named Defendant" is confounding and without merit. (Resp. R.18, PageID# 112.) They assert that "the only proper Defendant" in light of Rodriguez's allegations is the "Field Office Director of Enforcement and Removal Operations, New Orleans Field Office." (*Id.*) But Rodriguez *did* name, and serve, Scott Ladwig, Director of the New Orleans ICE Field Office, in his official capacity, as the immediate custodian of Petitioner who is responsible for her detention and removal. He is named as the lead Respondent. Frankly, Rodriguez does not understand what the Respondents are trying to argue.

28

In any event, Rodriguez has named multiple proper Respondents, and she would urge the Court to refrain from dismissing any of them unless the Respondents acknowledge that, in fact, the lead Respondent is a proper respondent who will abide by any ruling from the Court. *See Cerimovic v. Byers*, No. 2:24-026-DCR, 2024 U.S. Dist. LEXIS 154071, at *17 (E.D. Ky. May 8, 2024) (retaining the local jailer as a respondent in addition to the ICE Field Office Director); *Mejia v. Noem*, No. 1:25-cv-1227, 2025 U.S. Dist. LEXIS 215480, at *23–24 (W.D. Mich. Oct. 31, 2025) (retaining Secretary of Homeland Security).

**D.    The Respondents' assertions about the Declaratory Judgment Act are a red herring.**

Similarly confounding, the Respondents claim that Rodriguez relies on the Declaratory Judgment Act as "an independent basis for federal jurisdiction," which would be improper. (Resp., R.18, PageID# 117.) But Rodriguez bases jurisdiction on 28 U.S.C. § 2241 and invokes the Declaratory Judgment Act only as a basis for providing the remedy of declaratory relief when the Court already independently has habeas jurisdiction under § 2241. (Amend. Pet., R.14, PageID# 65.)

## IV.  Discovery

Rodriguez primarily seeks relief based on the existing record, but in the alternative she would request the chance to conduct discovery and subsequently have an evidentiary hearing.

"Petitioners in habeas corpus proceedings . . . are entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969). Thus, independent of the existence or applicability of any rules of court, it is the "duty" of a habeas court to authorize the petitioner to engage in discovery when justified. *Id.* at 300; *see Blackledge v. Allison*, 431 U.S. 63, 80–82 (1977) (remanding to grant habeas petitioner either an evidentiary hearing or discovery or both).

29

Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Pursuant to Rule 1(b), that discovery rule may be applied directly to § 2241 habeas proceedings. *Atikurraheman v. Garland*, No. C24-262-JHC-SKV, 2024 U.S. Dist. LEXIS 99422, at *15 (W.D. Wash. May 10, 2024). To show good cause under Rule 6, the "[p]etitioner need not show that additional discovery would definitely lead to relief." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000). Rather, a petitioner needs to show, though mere "allegations" rather than proof, only that there is "reason to believe" he or she may prevail if provided discovery:

> Where specific allegations . . . show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.

*Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris*, 394 U.S. at 299).[20]

Here, Rodriguez has, at a minimum, shown good cause for discovery. She has presented substantial evidence that Respondents retaliated against her for exercising her First Amendment rights as a journalist reporting on ICE enforcement activities. She has shown the ICE agents knew she was a *Nashville Noticias* journalist; that ICE sent her the G-56 letter relatively shortly after she starting regularly reporting on ICE, telling her they would issue an NTA, which would move her asylum application to immigration court; that it made little sense to issue an NTA since there were already 2.3 million asylum applicants waiting for adjudication in the immigration courts; that, after ICE scheduled her consensual meeting for March 17, she continued to report

---

[20] If the Court were to decline to directly apply Habeas Rule 6, the standard would essentially be the same because Rule 6's good cause standard is based on *Harris*, which set the standard prior to the creation of the Habeas Rules.

on ICE, including on March 2 and 3; that on March 4, ICE agents wrongfully arrested her on the street without a warrant; that, at the field office, an ICE supervisor chose to issue and have served upon her an arrest warrant—rather than releasing her on recognizance to later report at the Memphis immigration court—which meant she would be shipped to Louisiana and suffer a substantial deprivation of her physical liberty; that this decision to detain her was made even though every possible consideration, except for her public reporting on ICE, weighed in favor of release. Plus, the Respondents have conspicuously failed to submit any statement from anyone with personal knowledge of the events.

In sum, Rodriguez can show a constitutional violation, and she has a viable path to relief. Based on this showing, the Court should order discovery. Specifically, it should order the Respondents to produce, at a minimum, Rodriguez's complete "A file;" any other records ICE has produced or possesses regarding her; all records from the Etowah County Jail regarding her; all emails, text messages, and other communications it possesses regarding her; and all bodycam or other video footage of her arrest on March 4, and the aftermath. Rodriguez asks that, upon completion of this written discovery, she be permitted to either seek depositions or an evidentiary hearing or both.

## V. Conclusion

Estefany Rodriguez Florez respectfully requests that the Court grants relief on the current record or, in the alternative, that it grant the discovery requested.

31

Respectfully submitted,

*/s/ Michael C. Holley*
Michael C. Holley
Julio Colby
Spring Miller
TENNESSEE IMMIGRANT & REFUGEE RIGHTS
COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
mholley@holleylegal.com
julio@tnimmigrant.org
spring@tnimmigrant.org

*/s/ Joel Coxander*
Joel Coxander
MIRA Legal
486 Bell Road, Suite B
Nashville, TN 37217

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I electronically filed this pleading with the U.S. District Court Clerk by using the CM/ECF system to Assistant United States Attorney Mercedes C. Maynor, United States Attorney's Office, 719 Church St., Suite 3300, Nashville TN 37203.

*s/ Michael C. Holley*
MICHAEL C. HOLLEY

32