**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **ESTEFANY MARIA RODRIGUEZ FLOREZ,** | |
| Petitioner, | No. 3:26-cv-00247 |
| v. | |
| **SCOTT LADWIG, et al.,** | |
| Respondents. | |

**BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS, NATIONAL ASSOCIATION OF HISPANIC
JOURNALISTS, COMMITTEE TO PROTECT JOURNALISTS, NATIONAL PRESS
CLUB JOURNALISM INSTITUTE, FOREIGN PRESS ASSOCIATION USA, AND
INTERNATIONAL WOMEN'S MEDIA FOUNDATION IN SUPPORT OF PETITIONER**

Paul McAdoo, BPR No. 34066
    *Counsel of Record for Amici Curiae*
Lisa Zycherman*
Gabriel Rottman*
Mara Gassmann*
Allyson Veile*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
6688 Nolensville Rd. Suite 108-20
Brentwood, TN 37027
Phone: 615.823.3633
Fax: 202.795.9310
pmcadoo@rcfp.org

*Of Counsel*

**IDENTITY AND INTEREST OF AMICUS CURIAE**

Proposed amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), National Association of Hispanic Journalists, Committee to Protect Journalists, National Press Club Journalism Institute, Foreign Press Association USA, and International Women's Media Foundation (together, "amici").  Amici are organizations that work to defend the First Amendment and newsgathering rights of journalists and that have an interest in ensuring that immigration law is not interpreted and enforced in a manner that hinders or dissuades the press from gathering and reporting the news.  Amici write to provide the Court with information and argument regarding the potential impact of retaliatory arrests and detentions of reporters and the importance of habeas relief to vindicate core First Amendment rights.

Lead amicus the Reporters Committee is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists both nationally and in Tennessee, where it has full-time counsel resident in the state through its Local Legal Initiative.  The Reporters Committee regularly files in state and federal courts in Tennessee and elsewhere on issues of First Amendment significance.  *See, e.g.*, Br. of Amici Curiae Reps. Comm. for Freedom of the Press, et al., *Tennessee v. Johnson*, No. M2024-00959-SC-R10-CO (Tenn. Feb. 7, 2025).  And it has filed in several recent matters involving habeas relief for non-citizens that implicate press freedom.  *See* Br. of Amici Curiae Reps. Comm. for Freedom of the Press, et al., *Ozturk v. Trump*, No. 25-1019 (2d Cir. Aug. 25, 2025); Br. of Amici Curiae Reps. Comm. for Freedom of the Press, *Guevara v. Warden, Folkston ICE Processing Ctr.*, No. 5:25-

1

cv-86-LGW-BWC (S.D. Ga. Sep. 15, 2025); *see also* Br. of Amici Curiae Reps. Comm. for Freedom of the Press, et al., *Stanford Daily v. Rubio*, No. 5:25-cv-06618-NW (N.D. Cal. Oct. 15, 2025).[1]

**INTRODUCTION**

Amici write to underscore that the arrest and detention of non-citizen reporters covering issues in the public eye can serve as a potent means of suppressing newsgathering and reporting, especially when such coverage is perceived as unfavorable by government officials.

In this case, Petitioner Estefany Maria Rodriguez Florez ("Rodriguez") is a citizen of Colombia who resides in Tennessee. First Am. Pet. for Writ of Habeas Corpus (Dkt. No. 14) ¶ 8. Rodriguez worked as a journalist in Colombia prior to coming to the United States on a tourist visa in 2021. *Id.* ¶ 13; *see* Mikeie Honda Reiland, *Nashville Reporter Who Has Detailed ICE Activity Detained in South Nashville Stop*, Nashville Banner (Mar. 5, 2026), https://perma.cc/HM5S-ML4W (reporting that Rodriguez earned a journalism degree prior to coming to the United States and reported for several outlets in Colombia). According to her petition, she applied for asylum in 2021 and received a work permit in 2022. Am. Pet. ¶¶ 15–16. She has since married a U.S. citizen and is seeking permanent resident status. *Id.* ¶ 22. Additionally, since 2022, she has reported on social, family, health, police, and immigration issues for *Nashville Noticias*, a Spanish-language news outlet. *See* Am. Pet. ¶ 16; Angele Latham & Evan Mealins, *Arrest of Nashville Journalist by ICE Fuels First Amendment Concerns*, Tennessean (Mar. 11, 2026), https://perma.cc/Z37Z-276N. After the Trump Administration initiated its stepped-up

---

[1] Amici declare that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person, other than amici and their counsel, contributed money intended to fund the preparation or submission of this brief. An individual statement of interest of each amicus is set forth in the accompanying motion for leave.

immigration enforcement actions, the *Nashville Noticias* covered these developments as well. *See* Am. Pet. ¶ 18. In November and December 2025, Rodriguez's byline appeared on numerous articles about new federal immigration policy, ICE raids and law enforcement tactics, and the public response thereto. Am. Pet. ¶ 19 & n.1.

In January 2026, Rodriguez received a letter from ICE, known as a G-56, requesting that she appear at an ICE field office and notifying her of its intent to issue a formal Notice to Appear, which would begin removal proceedings in immigration court. *Id.* ¶ 20. She subsequently made an appointment for her and her attorney to meet with ICE agents to discuss her case, scheduled for March 17, 2026. *Id.* ¶ 25. But on March 4, 2026, while parking her vehicle bearing a *Nashville Noticias* sticker, Rodriguez was arrested by an ICE agent who took her into immediate custody. *Id.* ¶¶ 26–28. ICE kept Rodriguez in custody, transferring her to a facility in Etowah, Alabama, where she remains as of the filing of her amended habeas petition. *Id.* ¶ 34.

Rodriguez's petition alleges that her detention violates her First, Fourth, and Fifth Amendment rights. Amici seek to emphasize two specific points.

*First,* the arrest and detention of non-citizen journalists such as Rodriguez poses concrete harms to specific types of newsgathering and reporting, and the facts alleged here, if true, raise particular First Amendment concerns. There are many non-citizen journalists in the United States, and they perform public interest newsgathering and reporting every day. Indeed, they are often uniquely situated to report on certain topics and communities. They have special linguistic, cultural, geographic, and other knowledge that makes their reporting particularly valuable. To the extent they can be detained at will because of that reporting, specific news beats—immigration enforcement, for instance—could be chilled more than others. That presents a particularly insidious form of viewpoint discrimination. The predictable consequence of the arrest and

detention of these individuals is to end that speech and to chill a vast amount of future speech, especially by non-citizen journalists fearful that hard-hitting reporting on sensitive topics could lead to their detention.

*Second*, where the factual record suggests that the government is targeting journalists for arrest and detention because of the exercise of their right to gather and report the news and the content of that reporting, courts should apply a First Amendment retaliation analysis to the request for habeas relief. And where retaliation is shown, habeas should be granted to counter the extraordinary chilling effect on newsgathering and reporting in the public interest by non-citizen reporters, who may by virtue of their personal and professional background be more likely to cover immigration policy and immigration-related activity.

Amici urge that the Court analyze the habeas petition in light of these First Amendment considerations and reject the government's attempt to enforce the law in a manner that, in intent or effect, hinders or dissuades the press from gathering and reporting the news.

**ARGUMENT**

**I.     Non-citizen journalists, who often have special skills crucial to covering certain beats, perform important public interest newsgathering and reporting every day, and detentions of such reporters raise serious First Amendment concerns.**

There are many thousands of non-citizen journalists working in the United States whose speech is entitled to full First Amendment protection. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). For instance, the primary non-immigrant visa for foreign journalists working for foreign publications is the I-Visa. There were 12,150 journalists admitted on that visa in 2021, 25,270 admitted in 2022, and 32,470 admitted in 2023. *See* Aneer Rukh-Kamaa, *U.S. Nonimmigrant Admissions: 2023*, U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, at 2 (Aug. 2024),

https://perma.cc/4L3U-UC6V. There are many more non-citizen journalists working under different visas or who are permanent residents.

Foreign-born and non-citizen journalists are often uniquely situated to report or write on topics of importance based on particular personal experiences and cultural understandings, and the public benefits from access to the information and perspective they provide through enterprise reporting and news commentary. For example, Lingling Wei is the chief China correspondent for *The Wall Street Journal*, based in New York. *Lingling Wei,* Wall St. J., https://perma.cc/9434-86H3 (last visited July 30, 2025). Wei is a Chinese-born reporter who became a naturalized U.S. citizen in 2010, after she had spent eleven years studying and then working as a journalist in New York. Lingling Wei, *Forced to Leave China—and My Family*, Wall St. J. (June 6, 2020), https://perma.cc/PRE2-RFUA. After becoming a naturalized citizen, Wei worked for a decade in the *Journal*'s China Bureau, but she was expelled from China in 2020 along with several other American journalists, at which point she returned to the U.S. *Id.* She and several other members of the staff of the *Journal*'s Beijing Bureau were finalists for a Pulitzer Prize in 2021 for their in-depth series on China's leader, Xi Jinping. *See Finalist: Staff of The Wall Street Journal*, The Pulitzer Prizes, http://bit.ly/4fcczDv (last visited June 13, 2025). Wei's recent work has included coverage of U.S.-China trade negotiations, Lingling Wei, *Beijing Sees Opening in U.S. Trade War After Court Blunts Trump's Tariff Weapon*, Wall St. J. (Feb. 23, 2026), https://bit.ly/4sLwqim; China's involvement in negotiations to end the war in Ukraine, Lingling Wei et al., *China Tries to Play the Role of Peacemaker in Ukraine*, Wall St. J. (Feb. 13, 2025), https://perma.cc/X8JM-7UVG; as well as Chinese domestic affairs, Chun Han Wong & Lingling Wei, *China's Communist Party Replaces Senior Diplomat*, Wall St. J. (Sept. 30, 2025), https://bit.ly/4bxLMQP.

Similarly, Jorge Ramos worked for forty years as a news anchor based in Miami for Univision, providing news coverage to the Spanish-speaking community in the United States. Jesus Jiménez, *Jorge Ramos to Leave Univision After 40 Years at the Network*, N.Y. Times, (Sep. 9, 2024), https://perma.cc/WQ53-QTTD.  Ramos immigrated to the United States from Mexico on a student visa in 1983 and did not become a U.S. citizen until 2008.  Rigoberto Hernandez, *Journalist Jorge Ramos Takes on Obama, Republicans*, NPR (Feb. 2, 2015), https://perma.cc/E6M2-L8VK.  He has been called the "Walter Cronkite of Latino America" and his nightly news show averaged over a million viewers.  *Id.*  As an immigrant himself, he is well-positioned to serve the informational needs of his audience.  Stephania Taladrid, *Jorge Ramos, the Voice of Latino America*, The New Yorker (Aug. 17, 2024), https://perma.cc/YQZ5-ELW3.  His background and skills have allowed him to interview not only sitting U.S. Presidents, such as Barack Obama and George W. Bush, but also Spanish-speaking leaders of many Latin American countries, including the late Fidel Castro and Hugo Chávez.  *Id.*  As such, his reporting offers unique insights into his subjects.  *Id.*

As these examples illustrate, foreign-born journalists who come to the United States and work as non-citizens—whether they ultimately seek naturalization or not—often possess specialized linguistic and cultural knowledge that makes them particularly skilled at covering certain topics or subjects.  In that way, the suppression of their speech, and the chilling effect from detentions of non-citizen journalists may operate like a content- or viewpoint-based restriction by allowing retaliation specifically against, for example, hard-hitting coverage of increased immigration enforcement or other politically sensitive topics.

Courts have rejected viewpoint discrimination as antithetical to the First Amendment, and it is virtually never permitted.  *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Virginia*,

6

515 U.S. 819, 829 (1995) ("Viewpoint discrimination is thus an egregious form of content discrimination."); *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring) (calling viewpoint discrimination "poison to a free society"). Yet that is what the government does if and when it uses its immigration enforcement to thumb the scale of public discourse in its own favor.

Non-citizen journalists in the U.S. contribute to the store of knowledge on which the public depends in our constitutional system, and suppression of their disfavored viewpoints through retaliatory arrests and detentions, if unchecked by the courts, would interfere with the public's access to that information. Indeed, there are indications that the chilling effect of such viewpoint discrimination is already occurring, as some non-citizen journalists based in the United States are taking steps to self-censor in response to the federal government's stepped-up immigration enforcement. *See, e.g.*, Angela Fu, *Foreign Journalists in the U.S. Are Self-Censoring to Protect Themselves from the Trump Administration*, Poynter (July 14, 2025), https://perma.cc/CY3Z-ZYG6; Peter Schurmann, *Amid Deportations, Immigrant Journalists Face Heightened Risks for Their Reporting*, American Community Media (Apr. 24, 2025), https://perma.cc/X4HD-5RMA. That result is precisely the kind of "poison" the Constitution forbids.

## II. Habeas relief is the appropriate remedy for detention in violation of the First Amendment.

The constitutional core of habeas is to preserve a "means to secure *release* from unlawful detention," *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) (emphasis in original), including unconstitutional detention, *see* 28 U.S.C. § 2241(c)(3) (providing jurisdiction to extend writ of habeas corpus to those "in custody in violation of the Constitution"). Amici urge the Court to hold that where the government puts a journalist in detention pending adjudication of

removal proceedings in retaliation for their First Amendment-protected activity, habeas provides the appropriate remedy. *See Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 932–35 (W.D. Tex. 2018) (recognizing habeas petitioner had stated plausible First Amendment retaliation claims and denying government's motion for summary judgment as to those claims); *see also Aditya W. H. v. Trump*, 782 F. Supp. 3d 691, 712 (D. Minn. 2025) (concluding that where immigrant was "in custody in violation of the First Amendment," he was "entitled to a writ of habeas corpus for his immediate release"), *vacated on mootness grounds, Harsono v. Akerson*, No. 25-2413, 2026 WL 88549 (8th Cir. Jan. 8, 2026); *Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1157 (D. Minn. 2025) (granting habeas claim based on First Amendment retaliation); *Ercelik v. Hyde*, No. 1:25-CV-11007-AK, 2025 WL 1361543, at *13 (D. Mass. May 8, 2025) (concluding habeas petitioner was likely to succeed on First Amendment retaliation claim and ordering release).

While the government asserts that Rodriguez was arrested pursuant to a warrant, *see* Resp'ts' Show Cause Resp. (Dkt. No. 18) at 2–3—an assertion that Rodriguez disputes, *see* Pet'rs' Reply to Resp'ts' Prelim. Resp. (Dkt. No. 10) at 2 & Am. Pet. ¶¶ 28, 30–32—the resolution of Rodriguez's First Amendment claims ultimately does not turn on whether she was detained pursuant to a valid warrant, whether she is authorized to stay in the United States, or whether she is subject to removal. What matters is whether her detention is retaliatory in violation of the First Amendment. That is so because "claims of unlawful and retaliatory detention are independent of, and collateral to, the removal process." *Ozturk v. Hyde*, 136 F.4th 382, 397 (2d Cir. 2025). And although the government may have some authority under 8 U.S.C. § 1226(a) to detain those it places in removal proceedings, "detention can never be punitive, either by design or effect." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 232 (D. Vt. 2025) (citing *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)).

Because detention is necessarily punitive where it is motivated by a habeas petitioner's protected conduct, this Court's analysis of Rodriguez's First Amendment claims should be guided by a straightforward application of the elements of First Amendment retaliation. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (elements of First Amendment retaliation are "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."). While the analysis of those elements is necessarily "intensely context-driven," *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010), in habeas cases challenging immigration detention, "once a petitioner has made a showing of a First Amendment retaliation claim, the burden shifts to the government to show that it would have taken the same action even in the absence of the protected conduct." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (internal quotations omitted).

The government refers in a conclusory fashion to Section 1226(a) to justify detention here. *See* Resp'ts' Resp. at 8–9. However, it does not address why Rodriguez was sent a G-56 in January 2026, less than two months after she "started covering ICE arrests with regularity," *see* Am. Pet. ¶¶ 19–20, even though her visa had expired in 2021 and her asylum application had by then been pending for over five years, *id*. ¶¶ 14–15. That Rodriguez was detained shortly thereafter—and before any final order of removal was entered against her—may be indicative of retaliatory intent and, at a minimum, justifies a close review by this Court of the basis for her detention. *Cf. Gutierrez-Soto*, 317 F. Supp. 3d at 933 (noting evidence that ICE officials were "already targeting" journalists prior to a final order of removal which "allows for an inference that they were targeted" for their First-Amendment protected conduct).

And because Rodriguez challenges the basis for her *detention*, the government's contention that 8 U.S.C. § 1252(g) bars review should be rejected.  Section 1252(g) applies to claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien."  8 U.S.C. § 1252(g).  As ample precedent confirms, however, that provision does not apply to claims arising from unconstitutional detention, as distinguished from claims arising from the actions specified by Section 1252(g).  *See*, *e.g.*, *Ozturk*, 136 F.4th at 397 ("Section 1252(g) 'does not preclude jurisdiction over the challenges to the legality of [a noncitizen's] detention.'" (quoting *Kong v. United States*, 62 F.4th 608, 609 (1st Cir. 2023)); *Aditya W. H.*, 782 F. Supp. 3d at 704 ("Section 1252(g) cannot be read to deprive the Court of jurisdiction to consider a habeas petition" alleging detention in violation of the First and Fifth Amendments); *Mohammed H.*, 786 F. Supp. 3d at 1154 (concluding court had jurisdiction to review petition "seeking to review of the legality of [petitioner's] detention, nothing more"); *Mahdawi*, 781 F. Supp. 3d at 226 (concluding 1252(g) "allows for the exercise of habeas jurisdiction in cases that do not seek to challenge the removal proceedings but are directed instead at administrative detention alleged to be employed to stifle protected speech").

True, some courts have held that habeas petitioners may, in some circumstances, be required to wait to challenge their detention until after their eligibility for removal has been adjudicated in immigration court.  *See Khalil v. President, United States*, 164 F.4th 259, 276 (3d Cir. 2026) (concluding petitioner's First and Fifth Amendment claims could "be decided later" upon petition for review); Resp'ts' Resp. at 5–6.  But as explained above, addressing a retaliatory detention claim does not require "deciding whether removing [a habeas petitioner] would be unlawful," as the court in *Khalil* stated.  164 F.4th at 276.  Instead, it requires deciding whether subjecting a habeas petitioner—removable or not—to indefinite detention for the duration of the

removal proceedings extracts an unconstitutional penalty on the exercise of constitutional rights. The resolution of that question cannot await a petition for review. "Where a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is most pressing." *Boumediene v. Bush*, 553 U.S. 723, 783 (2008).

And here, there can be no question that the stakes are at their constitutional zenith. After all, a retaliatory detention has an "immediate and irreversible" impact on the right to gather and report the news, as much so as any classic prior restraint. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). For instance, in the context of on-the-scene newsgathering, the arrest of a journalist prevents the capture of "a unique set of images that might otherwise hold officials accountable." John S. Clayton, Note, *Policing the Press: Retaliatory Arrests of Newsgatherers After* Nieves v. Bartlett, 120 Colum. L. Rev. 2275, 2289 (2020). Addressing detentions and arrests generally, the Supreme Court has recognized that "some police officers may exploit the arrest power as a means of suppressing speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 99 (2018). As such, the danger of the government imposing retaliatory detentions on disfavored journalists would be an extreme form of First Amendment injury. And the "loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) (emphasis added).

In addition to the immediate freeze on newsgathering and reporting by the detained journalist that a retaliatory arrest and detention causes, the threat of indefinite detention could also unquestionably chill *other* non-citizen journalists from reporting on matters that may prove politically controversial. *See* Section I at 7, *supra*. "[E]ven minor punishments can chill protected speech," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002), and immigration detention pending adjudication can last for months or years. *See, e.g.*, Uriel J. García, *Mexican Journalist's*

11

*15-Year Quest to Receive U.S. Asylum Ends With a Yes*, The Texas Tribune (Sep. 14, 2023), https://perma.cc/A6TJ-FXP6 (noting journalist was detained from December 2017 to July 2018, but was not granted asylum until September 2023 following adjudication of claims). Non-citizen journalists faced with the risk of months-long detention may be discouraged from reporting or publishing on matters that could draw the attention of immigration authorities—further suppressing First Amendment-protected activity, and indeed, as noted above, there are indications this is already happening. *See* Section I at 7, *supra*. To ensure that the executive branch may not punish, and silence, disfavored non-citizen journalists, amici urge the Court to apply the foregoing analysis to the constitutional claims set forth in the petition and, if the facts warrant, to order Rodriguez's release from detention pending adjudication of her removal proceedings.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to grant Rodriguez's habeas petition.

Dated: March 16, 2026

Respectfully submitted,

*/s/ Paul McAdoo*
Paul McAdoo, BPR No. 34066
  *Counsel of record for amici curiae*
Lisa Zycherman*
Gabriel Rottman*
Mara Gassmann*
Allyson Veile*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
6688 Nolensville Rd. Suite 108-20
Brentwood, TN 37027
Phone: 615.823.3633
Fax: 202.795.9310
pmcadoo@rcfp.org

*\*Of Counsel*