|  |  |
|---|---|
| ESTEFANY MARIA RODRIGUEZ FLOREZ,<br><br>Petitioner,<br><br>v.<br><br>CHRISTOPHER BULLOCK, Field Office Director of Enforcement and Removal Operations, New Orleans Field Office, Immigration and Customs Enforcement, Respondent. | Case No. 3:26-cv-00247<br>Judge Richardson |

## PETITIONER'S MOTION FOR DISCOVERY

Petitioner Estefany Maria Rodriguez Florez (Rodriguez) moves for discovery so she can further establish her claims that U.S. Immigration and Customs Enforcement (ICE) subjected her to an unlawful warrantless arrest and illegally detained her in retaliation for her coverage of ICE as a journalist. As discussed below, she has already submitted substantial evidence supporting these claims, and today she has submitted declarations and documents that further support them. In contrast, the Respondent has offered neither evidence nor a consistent explanation justifying ICE's arbitrary and abusive treatment of Rodriguez. Because there is "reason to believe" Rodriguez may establish her claims "if the facts are fully developed," it is the Court's "duty" to "provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)); *see Blackledge v. Allison*, 431 U.S. 63, 80–82 (1977) (remanding for discovery or evidentiary hearing or both).

First, Rodriguez will review the relevant facts by very briefly summarizing facts already set forth elsewhere (Amend. Pet., R.14, PageID# 67–73; Reply to Resp. to Order to Show Cause,

1

R.20, PageID# 142–52) and by incorporating information from the declarations and records submitted today. (Not. of Filing Declarations, R.37, PageID# 243–64.) Second, under *Bracy*, she will show good cause for discovery by explaining why the current record firmly supports her claims and by showing that discovery is necessary to "fully develop[]" them, especially since the Respondent has failed to provide evidence or a consistent explanation that would justify its arbitrary and abusive treatment of her. *Bracy*, 520 U.S. at 909. She seeks leave to first conduct written discovery and to second conduct depositions. Absent depositions, she would request an evidentiary hearing.

### I. Factual Background

In March 2021, Estefany Rodriguez entered the United States on a tourist visa; in July 2021, while that visa remained valid, she timely applied for asylum based on fear of persecution at home for her work as a journalist; she was subsequently granted a work permit by U.S. Citizenship and Immigration Services (USCIS); and in 2022, she started working as a journalist for *Nashville Noticias*. (Reply to Resp., R.20, PageID# 142–44.) In January 2026, while still waiting for her asylum interview with USCIS, she married her husband, a U.S. citizen, and she submitted a petition for residency based on that marriage. (*Id.*; *see also* Medina Dec., R.20-1, PageID# 172–73.)

Rodriguez started regularly reporting on the Trump Administration's highly controversial ICE operations in November 2025. (Amend. Pet., R.14, PageID# 68–69; Amend. Pet. Ex. 3, R.14-3, PageID# 87–96.) That was risky because the Administration had already, in just eleven months, built a track record of both retaliating against journalists and of defending the unlawful actions of ICE agents. (Amend. Pet., R.14, PageID# 68; Amend. Pet. Exs. 1 & 2, R.14-1, PageID# 79–86; Reply to Resp., R.20, PageID# 144–46 & nn. 5–11.) In the case of a noncitizen

journalist held in immigration detention, ICE had argued that the journalist should remain detained because, according to ICE, his coverage of their operations jeopardized them.[1]

On January 10, 2026, which was less than two months after Rodriguez started regularly reporting on ICE arrests, ICE sent her a letter asking her to come to the ICE field office for a consensual meeting where they would issue her a Notice to Appear (NTA). (Amend. Pet., R.14, PageID# 69.) To her detriment, that NTA would move her asylum case from USCIS to the immigration courts, which already had a backlog of 2.3 million asylum applications to adjudicate. (Reply to Resp., R.20, PageID# 147, n.12; Amend. Pet., R.14, PageID# 71, n.8.) That meeting was eventually set for March 17. (Amend. Pet., R.14, PageID# 71; Form I-213, R.9-2, PageID# 48.) Notably, ICE has never offered a rationale for adding Rodriguez to that backlog.

With the threat of an NTA in the air, Rodriguez kept reporting on ICE operations. (Amend. Pet., R.14, PageID# 68–69; Amend. Pet. Ex. 3, R.14-3, PageID# 87–96.) Two incidents stand out in her mind. First, on February 16, 2026, Rodriguez went to film a live news segment at the site of an earlier ICE detention where the detainee's car had been left on the side of the road. (Rodriguez Dec., R.37-1, PageID# 248–49.) While filming, with her *Nashville Noticias* vehicle parked nearby, she was evidently scrutinized by an ICE agent who drove slowly past her and was seemingly intending to question whoever came to pick up the detainee's car. (*Id.*)

---

[1] *See* Liam Reilly, *Live-streaming journalist deported to El Salvador after months in ICE custody*, CNN (Oct 3, 2025, 4:38 PM), https://www.cnn.com/2025/10/03/media/mario-guevara-journalist-deported-ice-el-salvador ("Mario Guevara, the Salvadoran journalist who gained popularity by documenting immigration raids, has been deported after spending months in federal custody. . . . Although prosecutors dropped criminal charges stemming from Guevara's arrest, determining that he had complied with law enforcement, the government argued that Guevara ought to be kept in detention, alleging his live-streaming of law enforcement activities presented a risk to their work.").

Second, on March 3, 2026, she covered an unusual ICE arrest operation, presenting a video of that operation. (*Id.* PageID# 249.) Although *Nashville Noticias* often blurred agents' faces in these kinds of videos, this time they left the recognizable faces of ICE agents unredacted. (*Id.*) That story was reposted widely by social media users. (*Id.*)[2]

The next day, ICE agents arrested Rodriguez right after she and her husband dropped her daughter off for school. (Rodriguez Dec., R.37-1, PageID# 245.) It was obvious, due to their remarks, that the ICE agents knew her husband was a U.S. citizen and she had an application for residency pending. (Medina Dec., R.20-1, PageID# 173.) It was also obvious they knew Rodriguez was a journalist for *Nashville Noticias* since one agent possessed photos of her *Nashville Noticias* vehicle, which she was in at the time of her arrest. (Rodriguez Dec., R.37-1, PageID# 245.) Finally, it was predictable that, if ICE agents arrested the journalist who had been reporting on ICE arrests, her own arrest would be reported in the media, sending an intimidating message to the community and other journalists.

These ICE agents effected their arrest of Rodriguez without showing her any warrant (or any other document) or saying anything about a warrant. (Rodriguez Dec., R.37-1, PageID# 245.) It appears undisputed that arresting Rodriguez without a warrant would violate 8 U.S.C. § 1357(a)(2) since the ICE agents lacked probable cause to think she was "likely to escape before a warrant c[ould] be obtained for h[er] arrest." 8 U.S.C. § 1357(a)(2). The agents handcuffed her and drove her to the ICE field office. (Rodriguez Dec., R.37-1, PageID# 245.)

At that office, she was interviewed by an ICE agent, and then she was served with an NTA and an arrest warrant. (*Id.*) *Neither of these documents was signed.* (Rodriguez Dec. & Ex.,

---

[2] *See* video posted by Nashville Noticias (@nashvillenoticias) & Estefany Rodriguez Florez (@estefany_rodriguezperiodista), Instagram (March 3, 2026), https://www.instagram.com/p/DVcT40wkadH/.

4

R.37-1, PageID# 245, 251–52.) *See* 8 C.F.R. § 236.1(b), 287.5(e)(2). Although she was presented the unsigned documents, she was not given a copy—those copies would be provided over a week later when she arrived in a Louisiana detention center. (Rodriguez Dec., R.37-1, PageID# 245.)

Later that same day, March 4, ICE transferred her to the Etowah County Jail in Alabama, which ICE uses as a transit stop for detainees en route to ICE detention centers in Louisiana. (*Id.* PageID# 246.) The next day, March 5, Rodriguez was sent to an airplane for transport to Louisiana, but a guard inspecting the scalps of detainees said she had lice and sent her back to the jail. (*Id.*)

At the jail, the nurse never checked her for lice, and neither did any other official, but a detainee who helped her comb her hair said she did not see any lice, and Rodriguez herself never saw any sign of lice. (*Id.*) But due to the putative lice, Rodriguez was held for four to five days in a small cell in isolation that she was rarely allowed to leave, sometimes not even for meals. (*Id.*) Her PIN to make phone calls did not work, and the jail did not fix it. (*Id.* PageID# 246.) The jail refused to arrange any attorney-client phone calls. (*See* Reply to Resp., R.20, PageID# 151.)

After about four days of isolation, a guard took Rodriguez to the showers and made her strip naked. (Rodriguez Dec., R.37-1, PageID# 246.) The guard forcibly dumped a floor-cleaning liquid on her head, which burned her eyes, ears, and scalp. (*Id.*) The detainee who had been forced to assist cried and apologized to Rodriguez. (*Id.*)

On Thursday, March 12, after a total of eight days at Etowah, Rodriguez was flown to Louisiana. (Rodriguez Dec., R.37-1, PageID# 247.) Guards did not inspect anyone for lice, including Rodriguez herself, who never saw any sign of lice. (*Id.*) While in custody in both Etowah and Louisiana, Rodriguez encountered ICE officers who knew she was a journalist. (*Id.*)

5

On Saturday, March 14, Rodriguez was allowed to speak to her lawyers for the first time since leaving the ICE field office on March 4. (Reply to Resp., R.20, PageID# 151–52.) On March 16, an immigration judge reviewed her case, found her not to be a danger or a flight risk, and allowed her release on $10,000 bond. (Ex. 1 to Resp. Mem. Mot. to Dismiss, R.26-1, PageID# 127.) Even after her physical release on March 19, she has remained in ICE's "custody" (*see* Pet. Response to Rule 12 Mot. to Dismiss, R.38, PageID# 268–74), and ICE has retained her Colombian identification card (cédula), her Tennessee REAL ID driver's license, and her work permit without providing any receipt or without even acknowledging that fact. (Rodriguez Dec., R.37-1, PageID# 246, 248; *see* Resp. Updated Not., R.34, PageID# 232; Pet. Not. Regarding Release, R.33, PageID# 230.)

## II. Argument

"Petitioners in habeas corpus proceedings . . . are entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969). Thus, independent of the existence or applicability of any rules of court, it is the "duty" of a habeas court to authorize the petitioner to engage in discovery when justified. *Id.* at 300; *see Blackledge v. Allison*, 431 U.S. 63, 80–82 (1977) (remanding to grant habeas petitioner either an evidentiary hearing or discovery or both).

Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Pursuant to Rule 1(b), that discovery rule may be applied directly to § 2241 habeas proceedings. *Atikurraheman v. Garland*, No. C24-262-JHC-SKV, 2024 U.S. Dist. LEXIS 99422, at *15 (W.D. Wash. May 10, 2024). To show good cause under Rule 6, the "[p]etitioner need not show that additional

6

discovery would definitely lead to relief." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000). Rather, a petitioner needs to show, though mere "allegations" rather than proof, only that there is "reason to believe" he or she may prevail if provided discovery "[W]here specific allegations . . . show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris*, 394 U.S. at 299).[3]

Here, Rodriguez has, at a minimum, shown good cause for discovery. She has already, as discussed below, presented substantial evidence supporting her claims. Additional, useful evidence is likely in ICE's sole custody. Both written discovery and depositions are warranted.

**A.      Discovery is warranted for Rodriguez's detention-as-retaliation claims.**

Like the petitioner in *Ercelik v. Hyde*, No. 1:25-CV-1107-AK, 2025 U.S. Dist. LEXIS 88412 (D. Mass. May 8, 2025), Rodriguez alleges that ICE chose to detain her in retaliation for her exercise of First Amendment rights, and that consequently her detention violates both the First Amendment (because it is retaliatory) and the Due Process Clause of the Fifth Amendment (because it is punitive). *See id.* at *26–37. This "detention-as-retaliation" of Rodriguez, *id.* at *34, most palpably lasted from March 4 to March 19, yet the detention effectively continues to this day because she remains in ICE's custody and is subject to physical re-detention at any moment without cause. (*See* Pet. Resp. to Rule 12 Mot. to Dismiss, R.38, PageID# 268–74.) *See* 8 U.S.C. § 236.1(c)(9). *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021) ("[T]he

---

[3] If the Court were to decline to directly apply Habeas Rule 6, the standard would essentially be the same because Rule 6's good cause standard is based on *Harris*, which set the standard prior to the creation of the Habeas Rules.

decision [to redetain a person released on immigration bond] is completely discretionary."). Discovery on these claims is warranted in light of three facts.

*First*, the current record shows these claims have merit. To prevail, Rodriguez will need to show (1) that she "engaged in protected conduct," (2) that a materially "adverse action was taken against" her, and (3) that "there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [her] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). In the habeas context challenging immigration detention, "once a petitioner has made a showing of a First Amendment retaliation claim, 'the burden shifts to the government to show that it "would have taken the same action even in the absence of the protected conduct."'" *Bello-Reyes*, 985 F.3d at 702 (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)). Undisputably, Rodriguez's work as a journalist covering ICE operations is "protected conduct," and ICE's physical detention of her amounts to a materially "adverse action." The only disputed issue of fact is the "causal connection." *Thaddeus-X*, 175 F.3d at 394.

Even without discovery, Rodriguez makes a strong enough causal-connection showing to overcome summary judgment. Consider *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917 (W.D. Tex. 2018) where the noncitizen journalist challenged his immigration detention as unconstitutional retaliation for his criticism of ICE. *Id.* at 921. The court denied ICE summary judgment because the petitioner showed: (1) there was "temporal proximity" between his public criticism of ICE and ICE's detention of him (he was detained "a couple months" after the criticism); (2) that ICE had a track record of "allegedly targeting" five other "vocal activists" during the relevant time frame; and, (3) that after the petitioner's detention, ICE demonstrated animus against him since it told the director of the National Press Club to "tone . . . down" the

8

media's complaints about his detention. *Id.* at 933–34. The court concluded that this set of evidence "is enough evidence to create a genuine issue of material fact regarding whether Respondents retaliated against Petitioners for Mr. Gutierrez-Soto's comments." *Id.* at 934.

Here, Rodriguez can make the same kind of showing: (1) the "temporal proximity" in her case is comparable to that in *Gutierrez-Soto* because ICE sent her the NTA letter less than two months after she started regularly reporting on ICE operations; (2) the Trump Administration *circa* 2025 to 2026 has an extremely disturbing track record of retaliating against journalists and of encouraging abusive conduct by ICE agents (and indeed it has argued that a noncitizen journalist's coverage of ICE was a significant reason to keep him in detention); and (3) after Rodriguez's detention, ICE has demonstrated animus against her by subjecting her to physical abuse in the Etowah County Jail based on the lice pretext, by isolating her in a small cell and depriving her of phone access to her attorneys and family, and by arbitrarily confiscating her important personal records without so much as a receipt or acknowledgment of the fact. Add to this the fact that the ICE agents who arrested her knew she was a journalist for *Nashville Noticias*, and that they arrested her (unlawfully, without a warrant) the day after she presented a news story showing the recognizable faces of ICE agents. It was predictable that their arrest of Rodriguez would be reported by *Nashville Noticias*, thereby showing her followers and fellow journalists that the journalist who had shown ICE agent's faces the previous day was herself swept off the streets. Her proof of the requisite causal connection is, even without discovery, sufficient to overcome summary judgment, and consequently she easily satisfies *Bracy*'s standard, which requires only a finding that there is reason to believe she might prevail with discovery.

9

*Second*, the analysis of the causal connection question is "intensely context-driven." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010). ICE possesses the records crucial to establishing the context. Plus, its agents have unique personal knowledge on the issue. Yet the Respondent has disclosed nothing but a handful of documents, virtually none of which bear on the question of the causal connection. Authorizing written discovery and depositions is necessary to ensure Rodriguez has a "full opportunity for presentation of relevant facts." *Harris*, 394 U.S. at 298.

*Third*, Rodriguez's detention-as-retaliation claims are particularly important because the causal-connection question at the heart of her case has broad implications. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987). To date, the record shows that, on the heels of Rodriguez reporting on ICE's highly controversial operations, ICE subjected her to a pointless arrest and then abusively detained her for more than two weeks. That record sends a chilling message and signals a society devolving into a "police state." *Id.* It is crucial to determine whether Rodriguez's reporting on ICE played a role in prompting ICE to arrest and abusively detain her.

**B. Discovery is warranted for Rodriguez's Fourth Amendment claims.**

To prevail on her Fourth Amendment claim, Rodriguez must show the ICE agents arrested her without executing a valid arrest warrant. (Resp., R.18, PageID# 121 (defending the arrest only on the theory that it was an "arrest[] pursuant to a valid arrest warrant").) *See Rosada v. Figueroa*, No. CV 25-02157, 2025 U.S. Dist. LEXIS 156344, at *52 (D. Ariz. Aug. 11, 2025) (Rep. & Recommendation), *adopted by* 2025 U.S. 156336, at *53 (D. Ariz. Aug. 13, 2025).

10

To date, the record shows the putative arrest warrant dated March 2 was issued two days before the NTA dated March 4, and that fact suffices to prove the warrant invalid (because issued prior to the NTA), and hence that the arrest was unlawful. *See, e.g., Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 U.S. Dist. LEXIS 198295, at \*43, 45–46, 53–54 (N.D. Ill. Oct. 7, 2025). The record also shows the putative arrest warrant was not served on Rodriguez, and hence it was not executed and that the arrest was unlawful. (*See* Reply to Resp., R.20, PageID# 155–56.) Although the record seems clear regarding the factual predicates to these arguments, counsel for the Respondent declined to concede any facts at the show cause hearing when questioned by the Court. Discovery should be granted, in part, so Rodriguez can more firmly establish these points.

Plus, Rodriguez pursues a third theory: that, at the time of her arrest on March 4, no warrant had even been issued to arrest her. That is, her alternative[4] theory is that the handwritten warrant dated March 2nd is a post hoc fabrication to justify the retaliatory March 4th arrest, which was prompted, at least in part, by the news report Rodriguez issued March 3rd. There is ample reason to believe that is true and that discovery would clarify the record, which currently shows the following four things.

1. On March 4, Rodriguez was arrested by ICE agents who neither showed her a warrant nor mentioned one. (Rodriguez Dec., R.37-1, PageID# 245.)

2. Later that day, at the ICE field office, an agent gave her copies of an NTA and warrant, both of which were typewritten. (Rodriguez Dec. & Ex., R.37-1, PageID# 245, 251–52..) *Neither document was signed.* (*Id.*)

---

[4] To be clear, Rodriguez believes it is not necessary for her to prove this alternative theory in order to prevail on her Fourth Amendment claim.

3.      After Rodriguez filed her habeas petition challenging her warrantless arrest, the Respondent provided a photograph of a *handwritten* warrant that was incomplete (lacking her A number) and unserved (with a blank Certificate of Service). (Warrant dated March 2, R.9-1, PageID# 42.) Notably, the Respondent failed to provide a declaration from anyone saying when that warrant was (partially) filled out, when it was signed, when it was photographed, and where it had been.

4.      After media coverage of the parties' dispute over Rodriguez's warrantless arrest, the Department of Homeland Security posted a message on X.com calling Rodriguez's claim of a warrantless arrest a "hoax[]" and posting a copy of the typewritten March 4th warrant.[5] (Warrant dated March 4, R.15-1, PageID# 101.) This warrant appears to be the same warrant served on Rodriguez in the ICE office on March 4, except this one is signed.

Notably, counsel for the Respondent has refrained from tendering this signed, typewritten warrant to the Court, and has likewise refrained from providing any declaration from anyone with personal knowledge explaining the origin and history of this document. Unfortunately, it could be that this March 4th warrant was signed after-the-fact and then touted by ICE on X.com as (fabricated) proof that Rodriguez's claim of a warrantless arrest was a hoax.

This record raises grave doubts about the origin and validity of the handwritten, signed warrant dated March 2. If ICE, as it seems to do, creates warrants that are typewritten, why would it create a handwritten one (except so that the warrant would lack a computerized and

---

[5] *See* Homeland Security (@DHSgov), X (Mar. 7, 2026, 11:46 AM), https://x.com/DHSgov/status/2030339436156756271. In full, it states: "THIS IS FALSE. Here's the warrant. It's embarrassing when sanctuary politicians fall for these obvious hoaxes peddled by the media. We look forward to you correcting the record. Next time ask us and we will get you the facts." *Id.*

traceable record of its origin and history)? Why would a handwritten warrant be incomplete—that is, why would the officer filling it out happen to know the target's name but not her A number? Why would a supervisor ever sign an incomplete warrant like the one dated March 2nd—especially one that was not important enough to actually be served? If an ICE agent was carrying the warrant dated March 2nd in the field on March 4th, why wouldn't he serve it during the arrest? And if an ICE agent was carrying that warrant in the field when making the arrest, why wouldn't that be the same warrant served on the detainee in the field office? Why create a typewritten, *unsigned* warrant at the field office and serve that unsigned warrant instead of the signed one? There is ample reason to expect misconduct which, unfortunately, would not be all that surprising for today's ICE. *See Ercelik*, 2025 U.S. Dist. LEXIS 88412, at \*37 (finding ICE agents, who were alleged to have used detention as retaliation, misrepresented facts regarding the petitioner's arrest, saying: "[t]his cannot be true. In brief, not only was there no charging document when Respondents attempted to detain Petitioner on April 16, agents then misrepresented the date of service"); *Suri v. Trump*, 785 F. Supp. 3d 128, 146 (E.D. Va. 2025) (when addressing jurisdiction over the petitioner's detention-as-retaliation claim, finding that the "Respondent's answers to these questions [relevant to jurisdiction] are either non-responsive or riddled with inconsistences," including "post-hoc rationalizations" created to justify decisions about where to detain the petitioner).[6]

---

[6] These examples call to mind even starker and well-known examples that the media has detailed of ICE misconduct followed by misrepresentations: the killing of Renée Good, the killing of Alex Pretti, the harassment of Robert Held, and the systematic harassment of people in Los Angeles. *See* Danny Hakim, *Police Report Backs Activist's Account in Clash With ICE Agent Near Chicago*, N.Y. Times (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/us/ice-agent-assault-charge.html; Robin Stein et al., *How 'Turn and Burn' Immigration Operations Unleash Chaos — and Sweep up U.S. Citizens*, N.Y. Times (Dec. 20, 2025), https://www.nytimes.com/video/us/100000010596053/la-raid-immigration-us-citizens-video-investigation.html; Devon Lum et al., *New Video Analysis Reveals Flawed and Fatal Decisions*

13

At the very least, Rodriguez is entitled to discovery to establish the actual nature of her arrest and also to determine whether ICE engaged in post-hoc misconduct. Not only would the fact of such misconduct help establish her Fourth Amendment claim, but it would lend further support to her detention-as-retaliation claims because it would tend to show the requisite animus. *See Ercelik*, 2025 U.S. Dist. LEXIS 88412, at *36 (finding such misconduct by ICE "reinforces the idea that Petitioner's arrest is punitive"). Discovery is certainly warranted.

**C.     The Court should require the Respondent to produce records, answer interrogatories, and produce witnesses for depositions.**

Rodriguez is submitting, as Attachments 1 and 2, proposed written discovery requests. One is a request for production of documents that aims at the production of records that would show the reason that ICE decided, on January 10, to put Rodriguez in removal proceedings; the reason that ICE decided, on March 4, to arrest her on the street; the reason that ICE decided, later that same day, to detain her and ship her to Louisiana rather than releasing her on recognizance; and the reason that Rodriguez was held nearly incommunicado for nearly five days in Etowah County and assaulted by a guard. She also submits a set of written interrogatories aimed at clarification on the same subjects and at identifying the individuals with relevant knowledge. She asks that the Respondent be required to respond to these discovery requests within 21 days of their service. Finally, Rodriguez would seek leave to conduct depositions of up to seven individuals but would ask to identify those individuals after completion of the written discovery

---

*in Shooting of Pretti*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/video/us/100000010668660/new-video-analysis-reveals-flawed-and-fatal-decisions-in-shooting-of-pretti.html; *Video Analysis of ICE Shooting Sheds Light on Contested Moments*, N.Y. Times (Jan. 15, 2026), https://www.nytimes.com/2026/01/15/video/ice-shooting-renee-good-minneapolis-videos.html.

since the identities of people with knowledge presently remain unknown. Absent depositions, she would ask for an evidentiary hearing.

### III.  Conclusion

Estefany Rodriguez Florez has raised substantial claims of unconstitutional abuse by ICE. As a habeas petitioner, she is entitled to proceedings that will reliably determine if, in fact, her rights were violated. Because the Respondent possesses records and information crucial to determining the truth, discovery is the next logical and necessary step. She respectfully asks that the Court grant the requested discovery.

Respectfully submitted,


*/s/ Michael C. Holley*
Michael C. Holley
Julio Colby
Spring Miller
TENNESSEE IMMIGRANT & REFUGEE RIGHTS COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
mholley@holleylegal.com
julio@tnimmigrant.org
spring@tnimmigrant.org

*/s/ Joel Coxander*
Joel Coxander
MIRA Legal
486 Bell Road, Suite B
Nashville, TN 37217

Counsel for Petitioner

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2026, I electronically filed this pleading with the U.S. District Court Clerk by using the CM/ECF system to Assistant United States Attorney Mercedes C. Maynor, United States Attorney's Office, 719 Church St., Suite 3300, Nashville TN 37203.

s/ *Michael C. Holley*
MICHAEL C. HOLLEY

16